No. 24-3747

_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

_____

METRICOLOR LLC,

*Plaintiff-Appellant*,

v.

L'ORÉAL USA INC., ET AL.

*Defendants-Appellees*.

On Appeal from the United States District Court
for the Central District of California
No. 2:18-cv-00364-CAS-E
Hon. Christina A. Snyder

_____

## APPELLANT'S OPENING BRIEF

_____

Eduardo Martorell, Esq. (SBN 240027)
JoAnn Victor, Esq. (SBN 121891)
Martorell Law APC
6100 Center Drive, Ste. 1130
Los Angeles, CA 90045
(323) 840-1200
*Attorneys for Plaintiff-Appellant*

## DISCLOSURE STATEMENT

Appellant Metricolor LLC has no parent corporation and there is no publicly-held corporation that owns 10% or more of its stock.  F. R. App. P. 26.1(a).

Date: November 20, 2024  **Martorell Law APC**


 s/ Eduard Martorell
Eduardo Martorell
*Attorneys for Appellant Metricolor, LLC*

# **TABLE OF CONTENTS**

I. INTRODUCTION...................................................................1

II. JURISDICTIONAL STATEMENT .......................................2

III. ISSUES PRESENTED..........................................................3

IV. STATEMENT OF THE CASE................................................4

    A. Background Facts from Appellant's First Amended Complaint ..........4

    B. Procedural Background Leading to L'Oréal's Denied Summary Judgment Motion and Its Initial Request for Terminating Sanctions ...7

    C. L'Oréal's Motion for Summary Judgment and Requested Terminating Sanctions were Denied .......................................9

        1. MC613 ....................................................................9

        2. MC93-94 ...............................................................12

        3. MC43-46 ...............................................................14

        4. MC47......................................................................15

        5. Based on MC613, 93-94, 43-46 and 47, L'Oréal Sought Terminating Sanctions which the Court Denied.......................16

    D. No Order Issued on the Reconsideration Motion of L'Oréal, but the Court Grants Its Motion for Terminating Sanctions and Denies Metricolor's Motion for Reconsideration ...........................................18

        1. L'Oréal Files a Motion for Reconsideration.............................18

            a. L'Oréal's Contentions ...................................................18

            b. Metricolor Opposes the Motion for Reconsideration.....19

        2. Metricolor Opposes L'Oréal's Renewed Motion for Terminating Sanctions ..........................................................21

            a. The Number of Documents Involved in L'Oréal Renewed Motion for Terminating Sanctions was Intentionally Inflated; Metricolor Fully Intended to Abide by the Court's Orders Regarding Discovery .................21

b.     Weighing of the Evidence and Credibility Issues was a Jury    Question ............................................................... 24

c.     Metricolor's Case was Provable with L'Oréal's Documentary Evidence Alone ......................................... 28

3.     The Court Grants Terminating Sanctions and Suspends Ruling on L'Oréal's Motion for Reconsideration ............................... 29

    a.     Evidence Fabrication ...................................................... 31

    b.     Destruction of Evidence ................................................. 32

    c.     Withholding of Evidence ................................................ 32

       1.     BRG-1412 (Sal's email to Stephen; Sal proposes sending L'Oréal "fabricated user-experience testing results.") (1-ER-29.) .................................................. 33

       2.     BRG-3762 (Sal's email to Stephen; Sal says he 'wrote the results of a made-up interview with salon owners,' "allegedly referencing MC 93-94") .............. 33

       3.     BRG-1473 (Sal's email to Stephen and Steven Trzaska; Sal tells L'Oréal Metricolor would review its proposal and those of two competitors, but no competing proposals existed.) ...................................... 34

       4.     BRG-1280 (Metricolor's 9/16/2014 draft PowerPoint presentation to L'Oréal in October 2014, allegedly demonstrating Metricolor's 'first-generation' trade secret; slide notes of talking points mention only the second-generation Metricolor System not at issue in the lawsuit.) .................................................. 34

       5.     BRG-3510 (email chain between Sal and a consultant soliciting feedback on Metricolor's presentation; states the most important slide covers the cost savings of novel packaging—apparently relating to a presentation to L'Oréal in October 2014.) ................ 35

       6.     BRG-2345 (script for Metricolor's December 2014 meeting with L'Oréal where Metricolor allegedly recommended using the first-generation system, but this document is silent on that system.) (1-ER-34.) ........... 35

7.     <u>BRG-4093</u> (11/3/2014 email chain between Sal and Stephen; Sal proposed using a top that lacked "a self-sealing part to it," which Stephen rejects.) (1-ER-35.) …………………………………………………..36

8.     <u>BRG-1831/1806</u> (1831 is a 4/30/2012 Metricolor business plan describing its invention as an 'IV-type flexible bag with airtight seal and rubber ring stopper; L'Oréal contends it lacks reference to an alternative design without an airtight seal. 1836 is a business plan from 11/20/2014, also without mentioning a "first generation trade secret system." (1-ER-35.)................37

9.     <u>BRG-1545</u> (Power Point presentation listing Sal's brother Anthony on Metricolor's "Product Development Team" to assist with business development and marketing.)......................................37

d.     The Court's Analysis ......................................38

E.     Metricolor's Motion for Reconsideration ...........................41

1.     Metricolor Urges It Should Be Permitted to Speak to the Litigation's Merits.......................................................41

2.     L'Oréal Argued Terminating Sanctions Should Stand.............44

3.     Metricolor's Reply .....................................................44

4.     The Court Orders Terminating Sanctions................................46

V.  SUMMARY OF THE ARGUMENT ...............................................47

A.     Since the Court impermissibly combined alleged discovery missteps of differing natures to enhance the overall severity of sanctions, the Court committed reversible error.  The original discovery abuse involved PPDs and did not forewarn Metricolor that a istinct issue over ESI disclosure would subject it to terminating sanctions. ..........47

B.     Terminating sanctions were an abuse of discretion because the Court misassumed that Metricolor's forensic expert was required to disclose information gathered from Sal's computer before he disclosed his expert report. ........................................................................47

C.    Terminating sanctions were an abuse of discretion because Metricolor's allegations were provable based on L'Oréal's documents and admissions alone..................................................................47

VI.    STANDARD OF REVIEW ................................................47

VII.    ARGUMENT ........................................................................48

A.    The Court Abused Its Discretion in Imposing Terminating Sanctions Based on Two Distinct Forms of Alleged Discovery Abuse — One Relating to PPDs and the Other Based on Expert Disclosure of ESI .48

B.    The Court Abused Its Discretion in Issuing Terminating Sanctions After it Misassumed Cohen Should Have Disclosed Information Gathered from Sal's Computer before He Disclosed His Expert Report .................................................................................50

    1.    Metricolor Timely Disclosed the Cohen Image; No Court Order Required Earlier Disclosure of the Forensic Image of Sal's ESI ..51

    2.    To the Extent the Court Viewed the Cohen Image as Belatedly Disclosed Pursuant to the Discovery Code, It Lacked Inherent Authority to Penalize Metricolor ....................................................54

    3.    Whether under the Court's Inherent Authority or under FRCP 37,  the Cohen Image was Timely Produced, so Terminating Sanctions were an Abuse of Discretion .........................................56

C.    The Court Abused Its Discretion in Terminating the Litigation When Lesser Sanctions were Available and Warranted; the Court Should Simply Have Excluded Metricolor's Documentary Evidence and Granted Metricolor's Motion for Reconsideration .............................58

    1.    The Imposition of Terminating Sanctions Requires Restraint.......60

    2.    On Metricolor's Motions for Reconsideration, the Court Failed to Consider the Probative Value of L'Oréal's Evidence ..................62

    3.    In Ruling on Metricolor's Motion for Reconsideration, the Court Singularly Focused on Metricolor's Missteps Regarding the Non-Production of Documents that a Jury Did Not Require to Fairly Evaluate the Case .............................................................66

VIII.  CONCLUSION ....................................................................................67

# TABLE OF AUTHORITIES

Page(s)

Cases

*Chambers v. NASCO, Inc.*,
    501 U.S. 32 ................................................................................ 60

*Compass Bank v. Morris Cerullo World Evangelism*,
    104 F. Supp. 3d 1040 (S.D. Cal. 2015) .................................... 61

*Compass*, *supra*,
    104 F. Supp. 3d 10 ................................................................... 61

*Connecticut Gen. Life Ins. Co.* v. *New Images of Beverly Hills*,
    482 F.3d 1091 (2007) ......................................................... Passim

*Engelbrick v. Worthington Indus., Inc.*,
    944 F. Supp. 2d 899 (C.D. Cal 2013) ................................. 18, 20

*Faerfers v. Caviar Creator, Inc.*,
    359 Fed. Appx. 739 (9th Cir. 2009) ................................... 49, 50

*Fisher v. Ciba Specialty Chemicals Corp.*,
    2007 WL 987457 (S.D. Ala. Mar. 30, 2007) ...................... 50, 51

*Fiteq Inc. v. Venture Corp.*,
    2016 WL 1701794 (N.D. Cal. Apr. 28, 2016) .......................... 56

*Freedman v. Weatherford Intern. Ltd.*,
    2014 WL 4547039 (S.D.N.Y. Sept. 12, 2014.) ........................ 51

*Halaco Engineering Co., v. Costley*,
    843 F.2d 376 (9th Cir. 1988) ................................................... 56

*In re Napster, Inc. Copyright Litig.*,
    462 F. Supp. 2d 1060 (N.D. Cal. 2006) ................................... 57

*Kerr v. Jewell*,
    836 F.3d 1048 (9th Cir. 2016) ................................................. 47

*McKinney/Pearl Restaurant Partners, L.P. v. Metropolitan Life Ins. Co.*,
322 F.R.D. 235 (N.D. Tex. 2016) ................................................................. 23, 52

*Medina v., Boeing Co.*,
2022 WL 599021 (C.D. Cal. Jan. 27, 2022) ....................................................... 57

*Metricolor, LLC v. L'Oreal USA, Inc.*,
2022 WL 17072006 (C.D. Cal. Nov. 16, 2022) ........................................... 61, 65

*Mfg. Automation and Software Sys., Inc. v. Hughes*,
2018 WL 5914238 (C.D. Cal. Aug. 20, 2018) ................................................... 55

*Moore v. Publicis Groupe*,
287 F.R.D. 182 (S.D.N.Y. 2012) ....................................................................... 51

*Newberry v. Cnty. of San Bernardino*,
750 F. App'x 534 (9th Cir. 2018) ...................................................................... 55

*Noble v. Wells Fargo Bank, N.A.*,
771 Fed. Appx. 378 (9th Cir. 2019) .................................................................. 47

*PaineWebber Group, Inc. v. Zinsmeyer Trusts Partnership*,
187 F.3d 988 (8th Cir., 1999.) .......................................................................... 64

*Radio City, Inc. v. Celestron Acquisition4., LLC*,
2023 WL 5519324 (N.D. Cal. Aug. 25, 2023) .................................................. 61

*Raygoza v. City of Fresno*,
297 F.R.D. 603 (E.D. Cal. 2014) ...................................................................... 59

*Reinsdorf v. Skechers U.S.A., Inc.*,
296 F.R.D. 604 (C.D. Cal. 2013) ................................................................ 50, 64

*SEC v. Blockvest, LLC*,
2020 WL 2786869 (S.D. Cal. May 29, 2020) .................................................... 17

*Tinley v. Poly-Triplex Techs., Inc.*,
2009 WL 812150 (D. Col. Mar. 26, 2009) ........................................................ 25

*U.S. v. HVI Cat Canyon, Inc.*,
*2015 WL 12766161* (C.D. Cal. Nov. 20, 2015) ................................................. 61

*United States v. Hatfield*,
685 F. Supp. 2d 318 (E.D.N.Y. 2010) ................................................ 25

*United States v. Nat'l Med. Enters.*,
792 F.2d 906 (9th Cir.1986).............................................................. 49

*Wiersema* v. *Target Corp.*,
2024 WL 4406919 (C.D. Cal. Aug. 16, 2024.)................................... 57

Statutes

15 U.S.C. § 1121 ................................................................................. 3

18 U.S.C. §1836(b)(1)......................................................................... 3

28 U.S.C. §1332(a)(1)......................................................................... 3

28 U.S.C. § 1367 ................................................................................. 3

28 U.S.C. §§ 1331 and 1338(a)........................................................... 3

35 U.S.C. § 1 ...................................................................................... 2

2007 WL 98747 ................................................................................. 51

Rules

F. R. App. P. 26.1(a) .......................................................................... 1

F.R.E. 1003 ....................................................................................... 25

FRCP 26 and 37 ............................................................................... 17

FRCP 26(a)(2)............................................................................. 39, 48

FRCP 26(a)(2)(D) ....................................................................... 23, 52

FRCP 34 ............................................................................................ 55

FRCP 37 ................................................................................. 5, 54, 56

Rule 26(e)........................................................................................... 23

Rule 26(e)(1) ................................................................................ 23, 52

Rule 37(e) ........................................................................................ 54

## I.    INTRODUCTION

This appeal derives from the issuance of terminating sanctions against Appellant Metricolor LLC ("Appellant" or "Metricolor") after the Court[1] reconsidered its initial denial of such sanctions as requested by Appellees L'Oréal USA, Inc., L'Oréal USA Products, Inc., L'Oréal USA S/D, Inc. and Redken 5th Avenue NYC, LLC (collectively, alternatively, "Appellee" or "L'Oréal").  That sanction derived from issues concerning two different types of documents: physical documents Metricolor produced in responses to discovery and electronically stored information ("ESI") disclosed by Metricolor's forensic expert during his deposition.  The Court was troubled by alterations in the former and by the timing of disclosure of the latter.  Although these matters involved two distinct issues and forms of discovery, the Court impermissibly lumped them together as grounds for denying Metricolor its day in Court.

Appellant maintains less drastic measures were warranted and that a jury should have adjudged the parties' credibility and whether L'Oréal misappropriated Metricolor's trade secrets to profit from its industry-changing innovations concerning the application of hair dye products.  As argued below, a trial based on Appellee's documentary and testimonial evidence <u>alone</u> could have proven

---

[1] The term "Court" herein refers to the District Court whose terminating order is the subject of this appeal.

1

Metricolor's case and neutralized any claim of undue prejudice to L'Oréal. Instead, the Court prematurely terminated the $10-$30 million case and allowed L'Oréal to effectively win in its effort to "blame the victim." Further, many of the documents at issue in the Court's decision to end the litigation were either inadvertently produced and intended purely for internal use or were part of ESI that Metricolor maintains was timely provided by its forensic expert, Kevin Cohen.

In turn, the case's termination rested largely on a misplaced assumption of bad faith. The record shows Appellee's complaint in this regard was overblown and misleading. As such, Appellant maintains the Court abused its discretion in disregarding sanctions short of ending a case which had been litigated for a half dozen years at extraordinary cost to Metricolor and its counsel—a cost a global conglomerate like L'Oréal could afford to incur, but which has entirely crippled Metricolor's ability to profit from its revolutionary simplification of hair dyeing applications. Appellant respectfully maintains the Court abused its discretion in terminating the litigation and that the case should be remanded for a trial on the merits.

## II.    JURISDICTIONAL STATEMENT

In January 2018, Appellant sued in the Central District of the United States District Court, for claims including patent infringement under 35 U.S.C. § 1 *et seq.*, including §§ 271 and 281. The Court had original jurisdiction over that

2

action under 28 U.S.C. §§ 1331 and 1338(a), and over federal false advertising claims pursuant to 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331 and 1367. The Court had subject matter jurisdiction over related California state law claims pursuant to 28 U.S.C. § 1367. Appellant is headquartered in the Central District of California, where the alleged harm occurred.

On August 15, 2018, the case was dismissed without leave to amend on the initial motion to dismiss, which decision Metricolor appealed because it had never been provided even a single opportunity to amend. On January 6, 2020, the case was reassigned and remanded from the Federal Circuit, and Appellant was granted leave to amend; the subsequent amendment abandoned the patent infringement claim. Thereafter, Metricolor continued to claim diversity jurisdiction pursuant to 28 U.S.C. §1332(a)(1). The action's remaining claims included continuing to allege violation of the Defend Trade Secrets Act, 18 U.S.C. §1836(b)(1). As such, the Court had original jurisdiction over the federal trade secret action under 28 U.S.C. §§ 1331 and 18 U.S.C. § 1836(b)(1). Jurisdiction obtained for the related California state law claims pursuant to 28 U.S.C. § 1367.

### III.    ISSUES PRESENTED

(1)    Whether the Court erred in issuing terminating sanctions based on two distinct forms of alleged discovery abuse—one involving physically-produced documents and the other involving expert disclosure of ESI.

(2)     Whether the Court abused its discretion in issuing terminating sanctions after it misassumed that electronically stored information on Sal D'Amico's computer should have been produced before Metricolor's forensic expert Cohen timely disclosed it when asked about his work during his deposition.

(3)     Whether the Court erred in terminating the litigation when lesser sanctions were warranted.

## IV.     STATEMENT OF THE CASE

### A.     <u>Background Facts from Appellant's First Amended Complaint</u>

L'Oréal S.A. is a French company and self-proclaimed world leader in beauty products, including haircare.  As of 2018, it operated in 150 countries, with profits approximating 4.92 billion euros, and with 505 registered patents in 2018 alone.  L'Oréal S.A.'s worldwide subsidiaries include Appellees. (8-ER-1126.)

By contrast, Appellant is a small startup company founded by Stephen D'Amico ("Stephen") and his father, Salvatore ("Sal") D'Amico.[2]  Stephen is a master hairstylist with extensive salon experience. (8-ER-1126.)

The product at issue here stems from revolutionary technology (the "Metricolor System"), which includes novel packaging for hair color, developer (peroxide), bonder, and other agents and additives and allows hairstylists to accurately measure, dispense, mix, and combine those products to formulate hair

---

[2]Sal D'Amico is referenced as "Sal," to distinguish him from his son "Stephen."

4

treatments with time and cost-saving efficiency and accuracy, by novel use of a syringe. (8-ER-1126-1127, 1130-1132.)

Metricolor owns certain patents which, with related patent applications, describe limited aspects of the Metricolor System (alternatively, "System") and claims them as covered inventions. However, parts of the System, developed through Metricolor's research and development before and after filing of the patent applications (including during discussions with L'Oréal, sometimes at its request), were confidential and protected as Metricolor's trade secrets. (8-ER-1126, 1113-1116.)

In August 2014, confidential talks with L'Oréal began regarding its potential interest in buying, licensing, or partnering with Metricolor, to market the Metricolor System. These discussions employed a Non-Disclosure Agreement (the "NDA") between Stephen and Salvatore D'Amico, and "L'Oréal USA, Inc., together with its parent, subsidiaries and affiliates . . .." Metricolor was an intended third-party beneficiary.[3] The NDA was to guard the confidentiality of information shared with L'Oréal about the design and production of the System, and to explore a potential joint venture, licensing arrangement or acquisition. (8-ER-1127, 1136-1137.) In the NDA, L'Oréal expressly agreed not to "use, or

---

[3] Stephen D'Amico and Salvatore D'Amico assigned all rights in the Metricolor System to the company they own, Metricolor, in June 2016.

5

authorize the use of" such Confidential Information other than "to collaborate regarding Stephen D'Amico's METRICOLOR System. . . ." (8-ER-1137, 1118.) Further, L'Oréal was not to "copy or reproduce the Confidential Information in any medium," other than to collaborate with Metricolor; L'Oréal was also not to "decompile, disassemble or reverse engineer any part of such Confidential Information" without the Disclosing Party's written permission." (8-ER-1137, 1119.)

Over about a year and ten months of discussions/ negotiations regarding L'Oréal's supposed interest in acquiring the Metricolor System, L'Oréal received Metricolor's confidential information, learned how the System worked and how to replicate it. In June 2016, L'Oréal abruptly ceased negotiating with Metricolor since it could create a competing product using Metricolor's confidential information.

In September 2016, L'Oréal released two competing products, featuring and advertising aspects of the Metricolor System it had learned about over the course of the prior 25 months: the Matrix DMI Brand's (the "Matrix Brand") Matrixcolor Bond Ultim8 product and the Redken 5th Avenue NYC Brand's (the "Redken Brand") pH-Bonder product. (8-ER-1127-1128.)

**B.** **Procedural Background Leading to L'Oréal's Denied Summary Judgment Motion and Its Initial Request for Terminating Sanctions**

In denying L'Oréal's Summary Judgment Motion and Initial Request for Terminating Sanctions, the Court recounted the case's relevant procedural history, essentially as follows: Metricolor filed its First Amended Complaint ("FAC"), which alleged breach of contract, trade secret misappropriation under DTSA, breach of the implied covenant of good faith and fair dealing, violation of the California Unfair Competition Law; breach of confidence (later dismissed without prejudice- 8-ER-1124); and misappropriated trade secrets under the California Uniform Trade Secrets Act ("CUTSA"). (8-ER-1125-1123.)[4]

In July 2020, L'Oréal answered the FAC and filed a counterclaim and third-party complaint against Metricolor and its principals, Sal and Stephen D'Amico. The parties stipulated to dismiss the first counterclaim for relief. (7-ER-1093-1094.)

In 2020, discovery commenced, and the fact discovery cut-off was set for October 15, 2021. (7-ER-1091-1092.) Metricolor responded to L'Oréal's document requests with a 5,387-page PDF on January 29, 2021. Over ten witness depositions occurred in 2021, including L'Oréal personnel Marta Wolska-Brys and

---

[4]The case docket presents several versions of pleadings and motion-related papers. The referenced versions reflect the parties' primary arguments.

Scott Schienvar and Stephen of Metricolor. (*See* 6-ER-746.) L'Oréal concluded some of Metricolor's documents may have been altered or fabricated after the litigation began. (*See* 7-ER-1060.)

Thereafter, the Court let Metricolor choose between appointment of a special master or for the parties to coordinate use of L'Oréal's forensic expert, Paul French. (*See* 7-ER-1057.) Metricolor declined a special master due to its being cost-prohibitive to the small company. (7-ER-1057.) On December 22, 2021, the parties lodged a joint forensic inspection protocol, which the Court adopted. (7-ER-923-933, 934-935.)

On July 22, 2022, defendants moved for summary judgment and terminating sanctions, which Metricolor opposed. (*See* 6-ER-747.) L'Oréal then filed its Reply. (6-ER-747.) The Court denied that motion and the attendant request for terminating sanctions on November 16. (6-ER-745-769.) L'Oréal moved for reconsideration and then renewed that motion, but that motion was never ruled on.

On November 21, 2022, a scheduling conference set the deadline to exchange expert reports for January 30, 2023 and the expert discovery cut-off for March 27, 2023. (6-ER-743-744.) It is undisputed that Metricolor timely disclosed its rebuttal expert witnesses on February 27, 2023, including its forensic expert Kevin Cohen ("Cohen"), and that his expert report was timely submitted.

8

**C.** **L'Oréal's Motion for Summary Judgment and Requested Terminating Sanctions were Denied**

L'Oréal's Motion for Summary Judgment was denied due to triable issues of fact concerning Metricolor's allegations of trade secret violations, breach of contract and unfair competition claims. (6-ER-762-768.)  L'Oréal's dispositive motion also requested terminating sanctions over alleged discovery-related misbehavior of Metricolor's principals and its counsel.  In turn, the Court noted that French's forensic review found that four documents Metricolor had physically produced in discovery were edited during the litigation—documents MC000613 ("MC613"), MC000093-94 ("MC93-94"), MC000043-46 ("MC43-46") and MC000047 ("MC47") (collectively, "Physically-Produced Documents" or "PPDs").  (6-ER-751-758.)  As discussed below, the PPD, and other documents uncovered in ESI were to ground L'Oréal's later Motion for Reconsideration of terminating sanctions, and are the subject of the instant appeal.  The information below derives from the Court's ruling on L'Oréal's combined motion for summary judgment and terminating sanctions, which were denied and involved the PPDs only.

**1.** **MC613**

MC613 involved an email exchange between L'Oréal representative Wolska-Brys and Sal.  On March 28, 2016, Wolska-Brys emailed Sal that pending

9

finalizing of L'Oréal's evaluation agreement for transmission, "we will be asking you to supply 10 filled samples . . .." She then asked how long it would take to provide the samples. (6-ER-751.) On March 29, Sal responded, "your request to have our packages filled with your formulas will not [presently] be possible" due to "Metricolor' discussions with other companies." (6-ER-751-752.)

French's forensic review concluded MC613 was created March 16, 2020, after the FAC was filed, even though the document was dated March 29, 2016. (6-ER-752.)

On January 29, 2021, MC613 was part of Metricolor's document production. (6-ER-752.) Metricolor's production included PDF versions of the 2016 email exchange that contained the authentic messages. (6-ER-752.) On July 15, 2021, Metricolor produced the authentic, native version of the email. (6-ER-752.) When deposed on August 18, 2021, under questioning from L'Oreal of its own witness/former employee, Wolska-Brys testified she did not recall seeing MC613 and had not received samples. (6-ER-752.)

When deposed on September 22, 2021, Sal stated he drafted MC613 in 2016 and may have sent it to Wolska-Brys but he "[doesn't] know." (6-ER-752.) Two days later, L'Oréal informed Metricolor that documents, including MC613, were likely fabricated or altered after the litigation began. (*See* 6-ER-753.) On October 15, 2021, Sal accessed a copy of MC613 and photographed handwritten notes on

10

the document which read, "Cut + pasted + printed only.  Did not send." (6-ER-753.)  Thereafter, Metricolor claimed MC613 was work product.  (6-ER-753.)

Sal's recall was that he spoke by phone with Wolska-Brys after the 2016 email exchange and agreed to send other samples.  (6-ER-753.)  He thought he had sent a follow-up email about the samples, but could not locate it, so he recreated it by typing the body of the email he thought he had sent and attached "the header of the March 29, 2016 email" and then photocopied the composite. (6-ER-753-754.)  He then put the copy into a folder for L'Oréal-related information, but it was not intended for use as evidence or production. (6-ER-754.)  That folder was afforded Metricolor's counsel eight months later.  By then, Sal forgot he had recreated the email and his counsel did not realize it was a reconstruction before producing it as MC613. (6-ER-754.)  The error was obvious given no native version of the document existed.

Appellant maintains the document was not used by Metricolor in the litigation at any time and for any purpose whatsoever.  (6-ER-754.)  This included at Wolska-Brys's deposition, where it was L'Oréal alone that asked her about the document.  (6-ER-754.)  When Sal was first deposed in September 2021, he mistakenly testified he had created MC613 in 2016 but, at the time, he believed this was true since he was confused about the document.  He realized his mistake

11

in October 2022.  (6-ER-754.)  Sal maintained that the document was only meant for internal use and not for production or for use as evidence.  (6-ER-754.)

Importantly, Metricolor never made use of MC613 within the litigation, in any manner or for any purpose.

### 2. MC93-94

MC93-94 stemmed from an authentic email chain between the D'Amicos, Pat Parenty and others at L'Oréal.  (6-ER-754.)  There, Sal emailed Parenty product field results for 2014.  Attached was a legitimate document on the field testing and packaging costs; it included information on the impact of high viscosity testing on modifications to the product.  (6-ER-754-755.)  It describes how low viscosity product was dispensed and other product and packaging information.  (6-ER-755.)

 French's forensic review found the authentic version of the document had been updated in November 2020, despite being dated in October 2014.  (6-ER-755.)  MC93-94 involved a version of the authentic product field testing results, but included new information including a date of October 23, 2014, whereas the original was undated.  (6-ER-755.)  It also added certain commentary and parentheticals.  (6-ER-755.)

In January 2021, Metricolor produced MC93-94 to L'Oréal, which thereafter requested production of the email attachments for the email thread.  (6-ER-755.)

12

Metricolor's counsel then used MC93-94 during the deposition of L'Oréal's Scott Schienvar as an email attachment sent in 2014. (6-ER-755.) After Schienvar testified he had never seen the document, plaintiff's counsel, Mr. Martorell, recessed. Upon returning to the deposition, he noted some documents were produced without attachments, were therefore "jumbled" confusingly, and conceded that the document did not appear to be the actual email attachment given L'Oreal's counsel directing him to the correct attachment. (6-ER-755.) Importantly, this was the only time Metricolor's counsel attempted to use MC613 within the litigation.

In September 2021, Sal testified he did not think he had typed MC93-94 after litigation began and he was pretty sure the document had been an attachment or was distributed to L'Oréal at a meeting with it. (6-ER-755.) In October 2021, Stephen D'Amico testified, *inter alia*, that he was unaware of any record of his having discussed the product at issue with L'Oréal beyond what was in that document. (6-ER-755.) Soon after Stephen's deposition, L'Oréal deposed another witness, who produced the native, authentic document. (6-ER-755.)

Metricolor's counsel then asserted attorney work product protection over MC93-94. (6-ER-756.) Metricolor explained that changes to the native authentic MC93-94 stemmed from its counsel's request that Sal should type out previously hand-written information from notes Sal had drafted during the related December

13

2014 phone call.  (6-ER-756.)  Sal then updated the underlying document that became MC93-94, printed the document and put it in his L'Oréal documents folder.  As with MC613, Metricolor's counsel did not realize the document was not a copy of an original and produced it to L'Oréal.  (6-ER-756.)

As to the erroneous deposition testimony of the D'Amicos concerning MC93-04, Metricolor denied they knew, when deposed, that the document was inauthentic.  (6-ER-756.)

The Court found MC93-94 was meant to record Sal's contention that he and his son tested L'Oréal's product samples with both generations of the Metricolor System, including trade secrets as to the first generation.  (6-ER-756.)  L'Oréal disputed that the first-generation system was used for 2014 field testing or that the D'Amicos had discussed the results of such testing in a phone call in December 2014.

### 3.    MC43-46

MC43-46 is entitled "Professional Hair Color Packaging and Dispensing Research and Development Study."  French found it was created in April 2016 through 2017, after meetings with L'Oréal had ended.  (6-ER-757.)  He also determined a date in 2015 and the heading "*Presented R & D Results to L'Oréal/Matrix DMI Team in NYC" were added in 2020.  (6-ER-757.)  Metricolor produced the document in January 2021.  (6-ER-757.)  When deposed in October,

14

Sal testified he orally presented the salon owner survey in MC43-46 to L'Oréal at a November 2015 meeting. (6-ER-757.)

In April 2022, Metricolor claimed the document was attorney work product. (6-ER-757.) Metricolor informed the Court it would not use MC43-46 as evidence, but that Stephen's testimony that the mentioned study was orally presented to L'Oréal was true and "confirmed by the audio recording of the meeting held on that date" that had been produced in the litigation. (6-ER-757.)

Importantly, Metricolor never made use of MC43-46 within the litigation, in any manner or for any purpose.

### 4. MC47

Entitled, "Comparison of Tube Packaging VS METRICOLOR 'First Generation Prototype,*'" Metricolor represented this document as notes Sal created during litigation in response to L'Oréal's interrogatories. (6-ER-757.) It references 'First generation prototype components including a poly-plastic container and standard orifice reducer and syringe.' (6-ER-757.) It was produced in January 2021 and created the month before. (6-ER-758.) That September, Sal testified he doubted the phrase "first-generation prototype" came up after the litigation began. (6-ER-758.) Metricolor's counsel maintained this answer was erroneous but honest, because Sal was confused and did not realize the document

15

had been produced in discovery. (6-ER-758.) Metricolor argued the document was work product and would not be put into evidence. (6-ER-758.)

Importantly, Metricolor never made use of MC47 within the litigation, in any manner or for any purpose.

### 5. Based on MC613, 93-94, 43-46 and 47, L'Oréal Sought Terminating Sanctions which the Court Denied

Based on the PPDs (again, the "Physically Produced Documents") delineated above, the Court assessed whether terminating sanctions were warranted under the Ninth Circuit's test for such sanctions since the disputed documents would have bolstered Metricolor's allegations *if* used at trial. (5-ER-746,749-750.) The Court stated a finding of "willfulness, bad faith, and fault" alone would not suffice to end the litigation. (6-ER-758.) Rather, five factors still required consideration: "(1) the public's interest in expeditious resolution of litigation; (2) the court's need to manage its dockets; (3) the risk of prejudice to the party seeking sanctions; (4) the public policy favoring disposition of cases on their merits; and (5) the availability of less drastic sanctions." (6-ER-758, citing *Connecticut Gen. Life Ins. Co*. v. *New Images of Beverly Hills*, 482 F.3d 1091, 1096 (2007) ("*Connecticut Gen. Life*").)

L'Oréal argued that punishment less than termination would put Metricolor

16

"in the same position as litigants who play by the rules." (6-ER-759.) Metricolor countered with why Sal had updated and altered documents and how they were inadvertently produced, but never used as evidence. Metricolor also distinguished the affirmative use of false evidence in the cases L'Oréal had cited. E.g., *see Combs v. Rockwell Int'l Corp*., (attorney extensively and materially revised deponent's testimony); *SEC v. Blockvest, LLC*, 2020 WL 2786869 (S.D. Cal. May 29, 2020) (party intentionally uses forged declarations and proffers false testimony); *Connecticut Gen. Life*, *supra*, 482 F.3d at 1091 (blatant misrepresentation of document to gain advantage on the merits). Here, Metricolor argued it had not used the questionable documents to advance its case. (6-ER-760.) Metricolor further insisted "[t]he D'Amicos did not affirmatively proffer false testimony" to advantage themselves, but instead "offered uncertain testimony" in response to L'Oréal's questioning. (6-ER-760.) Hence, there was no "subjective bad faith" or "egregious" or "vexatious" conduct. (6-ER-760.)

The Court found Metricolor's MSJ response inconsistent, but found terminating sanctions were unwarranted. (6-ER-760.) Specifically, the Court concluded that while disclosure and "good-faith accuracy obligations" were implicated (e.g., under FRCP 26 and 37) a bad faith finding was unsupported. (6-ER-760.) Metricolor repeatedly proffered to abandon use of the PPDs at trial, and the Court so ordered, but also found that creation and production of those

17

documents was appropriate for "cross-examination" and impeachment. (6-ER-760-761.)

The Court denied terminating sanctions since putting the PPDs aside, misappropriation could still be found "based on circumstantial evidence" and the "totality of the circumstances." (6-ER-761.) The Court also noted the Ninth Circuit's five-fold factors "for case-dispositive sanctions" did not support terminating sanctions, and it distinguished the facts in the cases L'Oréal had cited. (E.g., *Engelbrick v. Worthington Indus., Inc.*, 944 F. Supp. 2d 899, 905 (C.D. Cal 2013) (9th Cir. 2015) (party knowingly gave false deposition testimony). (6-ER-761.) (9-ER-1249, 1228-1229.) At a related hearing, the Court observed the case was hanging by a thread, but Metricolor noted that L'Oréal's evidence alone would suffice.

**D.** **No Order Issued on the Reconsideration Motion of L'Oréal, but the Court Grants Its Motion for Terminating Sanctions and Denies Metricolor's Motion for Reconsideration**

    **1.** **L'Oréal Files a Motion for Reconsideration**

        **a.** **L'Oréal's Contentions**

L'Oréal again requested terminating sanctions in its Motion for Reconsideration based on additional evidence suggesting Metricolor and Sal had produced important notes misrepresented as being originals and that Sal had

testified falsely and inconsistently with a declaration opposing the sanctions motion. (5-ER-460.) L'Oréal claimed Sal had produced notes to look like original pencil on paper but which were actually produced mechanically. (5-ER-460-461.) L'Oréal also argued that while Sal had declared MC613 was made to look like it was drafted in 2016, it was actually created in 2020; at a subsequent deposition, Sal stated it was written in 2016. In an errata, he then claimed MC613 was drafted in 2018 when the lawsuit was filed. L'Oréal argued the date change was meant to evidence trade secret disclosure before the lawsuit's filing.

### b.    Metricolor Opposes the Motion for Reconsideration

In opposing L'Oréal's Motion for Reconsideration, Metricolor argued it had never used, or intended to use, MC613 for the litigation, including trial. (4-ER-332.) Moreover, L'Oréal's arguments were old and impermissibly raised on reconsideration beyond 14 days of the Court's order denying termination sanctions. (4-ER-332.) Metricolor offered to stipulate MC613 was created in 2020. (4-ER-333.)

Further, Metricolor disputed L'Oréal's new argument that Sal's handwritten notes were "fake" because photocopies, not originals, were produced. Metricolor noted photocopies are proper when originals cannot be found. (4-ER-333.) Sal had simply testified he honestly believed his notes were originals, although he was uncertain since eight years had passed since he created the notes. (4-ER-333.) As

19

with MC613, Metricolor argued L'Oréal had inspected the questioned notes in December 2022 (*id.,* citing 5-ER-626). Metricolor further argued that Sal's allegedly false deposition testimony about his notes occurred 11½ weeks before L'Oréal belatedly moved for reconsideration. (4-ER-341.)

Metricolor also pointed out that L'Oréal had wrongfully alleged that Sal faked an important email to himself from his brother's computer in 2014. (4-ER-333.) This important email was sent just two days after Sal's first meeting with L'Oréal, with a link to the online syringe company, Comar (which corroborated a major trade secret in that L'Oreal later used the exact same manufacturer, Comar, for its allegedly misappropriated product). (4-ER-333.) L'Oréal knew for years that Metricolor had used this email to corroborate trade secret claims. (4-ER-333.) Furthermore, the document was one of fourteen files subject to L'Oréal's forensic examination in 2021-2022, wherein L'Oréal's forensic expert found nothing untoward about the email's authenticity. (4-ER-333.) Metricolor's expert had also found it was an original. (4-ER-333.)

Metricolor then argued reconsideration of the issues was untimely and belated under the Court's scheduling order for expert reports. (4-ER-333.)

Whatever the parties' arguments, the Court never ruled on L'Oreal's Motion for Reconsideration.

20

**2.** **Metricolor Opposes L'Oréal's Renewed Motion for Terminating Sanctions**

**a.** **The Number of Documents Involved in L'Oréal Renewed Motion for Terminating Sanctions was Intentionally Inflated; Metricolor Fully Intended to Abide by the Court's Orders Regarding Discovery**

Metricolor opposed L'Oréal's Renewed Motion for Terminating Sanctions as including overblown accusations and as a diversion from Metricolor's provable allegation of trade secret misappropriation valued at $10-$30 million. (11-ER-1419.) L'Oreal's renewed motion included documents discussed in L'Oréal's initial motion for terminating sanctions, and added L'Oréal's claim that the forensic image made of Sal's computers by Metricolor's forensic expert Cohen ("Cohen Image") – and which image was first disclosed at Cohen's deposition – contained 50,000 images missing from a subsequent forensic image made by Setec ("Setec Image"). (*See* 3-ER-320, 295.) Of those, only 289 such documents — about half a percent of the documents of which L'Oréal initially complained — were of any interest and over 100 of those 289 were duplicates.[5] (11-ER-1419, 1423-1424.) This was without accounting for any privilege or production disputes.

_____

[5]Duplicates are charted in (11-ER-1423-1424.)

(11-ER-1424.)  In fact, L'Oréal <u>did not</u> challenge the privilege designations <u>or</u> push for a privilege log.

In the end, **including** the documents of which L'Oréal complained in its original request for terminating sanctions and which were known to it before disclosure of the Cohen Image, L'Oréal found only **13 documents** of note combined —many of which L'Oréal knew of since June 2020. (11-ER-1419, 1425.)  Even had all 13 documents been new to L'Oréal on the Cohen Image, this would amount to **.00026 of one percent** of the documents at issue for terminating sanctions 13/50000=.00026.)  While 50,000 is an imposing number, 13 is far less so.  The requested terminating sanctions was never about 50,000 hidden files or anything close to it, despite L'Oréal's original representations to the contrary.

Moreover, while Metricolor opposed L'Oréal's *second* fishing expedition of the Cohen Image (including the Setec Image), that opposition comported with the forensic review protocol.  During the initial forensic review in 2021-2022, L'Oréal focused on accessing relevant "computers" and "devices." (*See, e.g.,* 7-ER-1065, 1085, 1088; 7-ER-924; 3-ER-311.)  Metricolor provided those devices. (2-ER-155.)  Metricolor's counsel never contemplated that the Setec Image would differ substantively, or have independent relevance, from the Cohen Image and L'Oréal never asked Metricolor if a parallel computer image existed.  (2-ER-155-156.)

Cohen never afforded Metricolor's counsel a copy of the Cohen Image since it was made solely for Cohen's reference. (2-ER-155-156.)

Thus, while L'Oréal claimed Metricolor and its counsel "hampered the investigation into [the allegedly fabricated] documents" (3-ER-185) by opposing both forensic reviews (3-ER-174-176, 187), Metricolor always agreed to forensic review in principle, but properly objected to its scope and certain procedures – objections often upheld in whole or in part. (See 6-ER-797; 7-ER-986-989; 7-ER-941-945.)

In opposing L'Oréal's second request for terminating sanctions, Metricolor argued it was unobliged to disclose the Cohen Image. L'Oréal maintained Rule 26(e) required such production. **While Rule 26(e)(1) involves an on-going duty to supplement discovery responses**, **it does <u>not</u> address whether a party must forensically review its computer to find responsive documents**. Moreover, FRCP 26(a)(2)(D) and the Court's Scheduling Order <u>did not require earlier disclosure of expert testimony than occurred</u>. Federal discovery-related rules do not require retained experts to disclose their work as it is performed; there is no precedent for this. Further, a party is not ordinarily required to forensically review its own systems to identify documents for production. *See McKinney/Pearl Restaurant Partners, L.P. v. Metropolitan Life Ins. Co*., 322 F.R.D. 235, 249 (N.D. Tex. 2016) ("*McKinney*"). Here, the Court-ordered forensic review specified a

23

defined scope pursuant to stated procedures. (See 7-ER-923-933; 3-ER-262-278.)

Metricolor complied.

> **b.** **Weighing of the Evidence and Credibility Issues was a Jury Question**

The documents at issue in L'Oréal's renewed request for terminating sanctions addressed whether such documents were intended to deceive. Metricolor maintained this was a jury issue. The first involved an email[6] wherein Sal proposed telling L'Oréal about interview results that would be "total bullshit and a lie," but that draft email was **never sent** L'Oréal. (*See* 11-ER-1427.) Similarly, Sal used loose language in BRG-1362 which discusses a "made up interview" with salon owners and hairstylists from 2015. In fact, Sal and Stephen <u>did</u> conduct interviews with salon owners and hairstylists that year. (11-ER-1421 and 1427.)

L'Oréal accused Sal of manipulating documents that he viewed as "work product" and/or were his personal notes. (11-ER-1432.) As to documents MC93-94 and 43-46, Sal testified he supplied a missing date so counsel would know what they were from. (11-ER-1433-1434, 1437-1438.) As noted above for MC613, Sal testified he had problems locating an email to L'Oréal personnel about requested Metricolor samples, so he tried to recreate it for his attorneys. (11-ER-1440, 1444-

---

[6]The Court also noted this document in granting terminating sanctions.

1445.)  He agreed he created the document in 2020, after the litigation was filed. (6-ER-802-803.)

Next, L'Oréal argued Sal fabricated handwritten testing notes, but Metricolor maintained they were authentic originals and that authenticity was a jury issue.  Metricolor also maintained photocopies should suffice if it were determined Sal's notes were not originals. (4-ER-340-344.)

As to MC000088-92 ("MC88-92"), L'Oréal challenged the authenticity of Sal's handwritten notes on field tests conducted in 2014 using the Metricolor System with L'Oréal' product samples.  (*See* 1-ER-27-28.)  Metricolor reasserted fabrication was a jury question.[7]

L'Oréal also claimed Metricolor inconsistently pitched the Metricolor System.  Metricolor insists it consistently pitched its second-generation system, while also giving L'Oréal details of its trade secret first-generation system.  (6-ER-775-780.)  Again, Metricolor argued the weighing of evidence was for jury determination.

---

[7] Citing F.R.E. 1003; *United States v. Hatfield*, 685 F. Supp. 2d 318, 319-20 (E.D.N.Y. 2010) (copy of corporate resolution admissible despite government's claim original was fraudulent, which was a jury question); *Tinley v. Poly-Triplex Techs., Inc.*, 2009 WL 812150, at *4, *8 (D. Col. Mar. 26, 2009) ("*Tinley*") (when original missing and allegedly fake, photocopied handwritten document admissible--its authenticity a jury issue).

L'Oréal's renewed request for terminating sanctions addressed the following documents which, are, in part, also addressed by the Court in its dismissal of the case:

- BRG-1473 references Metricolor shopping the Metricolor System to competitor companies. While Sal may have exaggerated his comments to L'Oréal about Metricolor's license discussions with third parties, it did not show lying under oath or intentionally creating false evidence.

- BRG-1280 is a PowerPoint presentation last saved by Sal on September 16, 2014.

- BRG-3510 is an email wherein Sal calls a friend a "consultant" as to a Power Point presentation that does not mention the first-generation system; Metricolor acknowledged communications with L'Oréal were mainly based on the second-generation system.

- BRG-2345 was silent on the first-generation Metricolor System. Its last accessed date is October 5, 2021, but Metricolor maintained alleged access dates were unreliable.

- BRG-1806/1831 focuses on the second-generation Metricolor System.

- BRG-1545 allegedly challenges Metricolor's claim that Anthony D'Amico was uninvolved in Metricolor. L'Oréal argues he was an undisclosed percipient witness, but L'Oréal pursued no new discovery request on this until the instant Motion.

- BRG-997 was clawed back by Metricolor as privileged and/or work product and was related to patent application issues.[8]  Metricolor argued it was irrelevant or nonresponsive, so not subject to production – apart from being privileged.  L'Oréal did not challenge Metricolor's objections to production during fact discovery.
- BRG-3879 is an immaterial communication between the D'Amicos and Steven Trzaska wherein Trzaska indicates his conditional departure from Metricolor.[9]

(3-ER-165-194; 1-ER-29-37.)

Prior to the termination of the litigation, Metricolor maintained it was unobliged to produce these (or any of the Cohen Image) documents.  As argued below, termination was unwarranted under these facts.

Metricolor's opposition to L'Oréal's second request for terminating sanctions underscored the following misrepresentations and attempts to manipulate the Court: First, L'Oréal claimed, without support, that Trzaska had testified Metricolor's trade secret included only a 'sealing' orifice reducer as a component of the system. (E.g., 3-ER-192.)  Even if true, Trzaska was uninvolved with Metricolor until 2016—over a year after the trade secret disclosures.  (3-ER-259.)  He is not a percipient witness as to Metricolor trade secrets in 2014-2015 or its

---

[8]This issue was addressed on the merits in 3-ER-202-204.
[9] Metricolor addressed this document in 3-ER-205.

disclosures to L'Oréal. Moreover, at Metricolor, Trzaska focused on the patented Metricolor System, not trade secrets. (3-ER-258-259, 260.)

L'Oréal also misrepresents discussion of MC43-46, a professional hair color dispensing and formulation research study Sal updated during litigation with a notation stating: "11/23/15 Presented R&D Results to L'Oréal/Matrix." This was true (e.g., 6-ER-841), despite L'Oréal's contrary claims.

### c. **Metricolor's Case was Provable with L'Oréal's Documentary Evidence Alone**

In opposing terminating sanctions, Metricolor urged its allegations were provable even if Metricolor abandoned use of its own documentary evidence at trial. Over twenty-five depositions, recorded conversations and L'Oréal's <u>own</u> documents supported alleged trade secret misappropriation. (6-ER-841-842.)[10] Indisputably, there were three in-person meetings between the parties that included Scott Schienvar, then Vice President of Operations for L'Oréal USA in its Professional Products Division. (11-ER-1464, 1466-1467.) The accused Matrix

---

[10] Illustratively, in a recorded audio, the head of L'Oreal's Matrix line (which is alleged to have misappropriated the trade secrets), Dan Bethelmy-Rada, commented: "I think you're touching the right points, right from the beginning. So what I like about the project is two things. One, **it's coming from a real hairstylist inside. That's important. It's based on your own experience, and I think that's how powerful this can be**. And second, it's also, for the brand, it's also interesting for sustainability pieces and all of that." (6-ER-896) (emphasis added).)

and Redken bonder products were both in that division, and fell under Schienvar's purview. (11-ER-1451.) The evidence also underscores that Schienvar was pressured to help realize the strategically important bonder products and so used Metricolor's trade secrets to move the Matrix and Redken brands toward use of the Metricolor process. These facts alone, L'Oreal's own words, could have convinced a jury that a $10-$30 million trade secret had been misappropriated. Not to mention over 70,000 pages of records produced by L'Oreal.

3. **The Court Grants Terminating Sanctions and Suspends Ruling on L'Oréal's Motion for Reconsideration**

Before any ruling on its Motion for Reconsideration, L'Oréal refiled its motion for terminating sanctions, which was granted on March 29, 2024. Within its Order, as background, the Court noted that forensic findings challenged alleged trade secret disclosure, and that plaintiff had altered documents to "conceal the fact no disclosure was made." (1-ER-13.)

The Court also discussed the creation of the "Cohen Image" and the "Setec Image", after L'Oréal informed Metricolor that some documents seemed altered after the litigation began, and requested forensic analysis of Sal's computer and iPad. (1-ER-15.) On October 8, 2021, plaintiff's expert, Cohen, had created a forensic image of Sal's computer (the "Cohen Image"). (1-ER-15.)

29

Thereafter, the parties coordinated use of forensic expert, Paul French. (1-ER-15.) During the last two months of 2021, the Court directed L'Oréal to have Setec Investigations forensically image Sal's computer ("Setec Image"), which was created in December 2021. As with all of Metricolor's experts' work prior to the expert disclosure deadline, the Cohen Image was unknown to the Court or L'Oréal at this time. (1-ER-16.)

In 2022, French completed reviewing the Setec Image and determined four images were altered after the litigation began. (1-ER-16.) L'Oréal thereupon filed its motion for summary judgment and for terminating sanctions, which were denied, as discussed above. (1-ER-16.)

In March 2023, L'Oréal deposed Metricolor's forensic expert, Cohen, learned of the Cohen Image, and requested a copy. (1-ER-16.) L'Oréal then filed its motion for reconsideration of the Court's order denying terminating sanctions, and the Court ordered Metricolor to provide French with a copy of the Cohen Image. French declared that he found over 50,000 documents on the Cohen Image that were not on the Setec Image and that thousands more documents were potentially lost through continued use of Sal's computer after the Cohen Image was made. Metricolor's expert, Kevin Cohen, pointed out a variety of faulty analysis by Mr. French. (3-ER-251-254; 3-ER-201-209.) The Court also directed the parties to review the Cohen Image. (1-ER-16.)

30

On June 12, 2023, French narrowed the range of possibly relevant documents on the Cohen Image and delivered a production log of 5,653 files to Metricolor, which Metricolor reviewed for privilege or privacy claims. (1-ER-17-18.)

The Court then reapplied the fivefold test under *Connecticut Gen. Life* case, *supra*, 482 F.3d at 1096 for determining whether a case dispositive sanction was appropriate.[11] The Court addressed issues with the integrity of the discovery process, and if the litigation could be sure to proceed "on the true facts." (1-ER-19.)

### a. Evidence Fabrication

Here, the Court focused on documents MC613, 93-94, 43-46 and 47—all part of L'Oréal's initial request for terminating sanctions. The only new series of previously produced documents the Court addressed concerning L'Oréal's renewed request for terminating sanctions involved documents MC88-92.

MC88-92 included purportedly confirmed Metricolor's testing of L'Oréal products with Metricolor's first-generation system in 2014. (1-ER-27.) Metricolor relied on those notes to oppose L'Oréal's initial motion for sanctions and summary judgment. (1-ER-27.) When deposed, Sal testified "at least the first page was written years later to 'show [his] attorneys the process'" involved in Metricolor's

---

[11]See section C, subsection 5 above.

testing of L'Oréal's products "with its first-generation system in 2014." (1-ER-27.)  Metricolor argued fabrication was a jury question. (1-ER-28.)

###### b.    Destruction of Evidence

The Court found Metricolor had represented Sal's computer was "dead", but that French's review of the Cohen Image showed deliberate altering of the computer, with thousands of files on that image deleted before the Setec Image was made. (1-ER-28.)  Of the 5,653 files French stated might be relevant, forty-five percent were in "unallocated clusters" and deleted. (1-ER-28.)  French surmised deletions "included relevant documents." (1-ER-28.)  Metricolor countered that the huge majority of available documents were unimportant and perhaps ten percent of those files required review. (1-ER-28.)  It previously supported this argument by pointing out a slew of "false and misleading assertions about the forensic files" by Mr. French. (3-ER-201-209; 3-ER-251-254.)

###### c.    Withholding of Evidence

L'Oréal maintained Metricolor did not disclose responsive unproduced documents, and moved to cancel the forensic review. (1-ER-29.)  L'Oréal also claims it found "at least 280 relevant documents," including the following, but focused on about two hand fulls:

32

1. <u>BRG-1412</u> (Sal's email to Stephen; Sal proposes sending L'Oréal "fabricated user-experience testing results.") (1-ER-29.)

Sal called the results "total bullshit and a lie" but that "there is no way to prove that we did not do [the testing.]" (1-ER-30.) While loose language between father and son, Metricolor argued it did not indicate dishonesty because the testing in question was **never sent** L'Oréal. (*See* 11-ER-1427.) In short, this loose language was a red herring.

2. <u>BRG-3762</u> (Sal's email to Stephen; Sal says he 'wrote the results of a made-up interview with salon owners,' "allegedly referencing MC 93-94")

L'Oréal maintains the 'results' refer to MC 43-46 as Sal had edited the document and emailed himself a copy a day before emailing Stephen to remind him of the "fake study." (1-ER-31.) L'Oréal maintained Metricolor misled the Court in responding to the original sanctions motion by insisting the *substance* of MC43-46 was genuine. Metricolor countered that hairstylist and salon owner interviews <u>had</u> occurred in 2015 about 'hair coloring practices' to demonstrate the usefulness and usability of the Metricolor System. (1-ER-31; 11-ER-1421.) Thus, the document did not suggest dishonesty or make a misrepresentation to the Court in Metricolor's prior opposition to sanctions.

33

     3.    <u>BRG-1473</u>  (Sal's email to Stephen and Steven Trzaska; Sal

         tells L'Oréal Metricolor would review its proposal and those

         of two competitors, but no competing proposals existed.)

Metricolor acknowledged the exaggerated/"sales puffery" licensing

discussions, but denied it showed Sal "lied under oath or intentionally created false

evidence . . .." (1-ER-32.)

     4.    <u>BRG-1280</u> (Metricolor's 9/16/2014 draft PowerPoint

         presentation to L'Oréal in October 2014, allegedly

         demonstrating Metricolor's 'first-generation' trade secret;

         slide notes of talking points mention only the second-

         generation Metricolor System not at issue in the lawsuit.)

L'Oréal notes Sal accessed the document during discovery on September 7,

2021--the day the presentation was produced without the script. (1-ER-33.)

Plaintiff argued a lack of relevance given Sal last saved the document on

September 16, 2014.  (1-ER-33.)

     5.    <u>BRG-3510</u> (email chain between Sal and a consultant soliciting feedback on Metricolor's presentation; states the most important slide covers the cost savings of novel packaging—apparently relating to a presentation to L'Oréal in October 2014.)

L'Oréal maintains this document shows the first-generation system was not at issue since the presentation only lists costs for the second-generation system. This counters document MC47, which L'Oréal maintains was fabricated to suggest cost-savings information was presented at some point about the first-generation packaging cost.

Metricolor maintains this document was cumulative of others that are silent on Metricolor's first-generation System that implicated trade secrets and supports Metricolor's acknowledgement that discussions with L'Oréal focused primarily on the second-generation system. (1-ER-33-34.)

     6.    <u>BRG-2345</u> (script for Metricolor's December 2014 meeting with L'Oréal where Metricolor allegedly recommended using the first-generation system, but this document is silent on that system.) (1-ER-34.)

L'Oréal maintains Sal fabricated MC93-94 to suggest the first-generation system was recommended at the December meeting with L'Oréal. Metricolor

35

maintains it is cumulative and that L'Oréal failed to show the last accessed date was reliable.  (1-ER-34.)

> 7.  BRG-4093 (11/3/2014 email chain between Sal and Stephen; Sal proposed using a top that lacked "a self-sealing part to it," which Stephen rejects.) (1-ER-35.)

L'Oréal notes the email is shortly after the October 9 meeting wherein Metricolor was to have disclosed a system with "a standard orifice reducer." L'Oréal maintains this shows Metricolor lacked a "standard, non-sealing orifice reducer trade secret before it purportedly conveyed one to L'Oréal."

Metricolor maintains that while it primarily pitched its second-generation system, it also related details of its first-generation system to L'Oréal and that whether first-generation information was shared was a jury question.  Further, Metricolor maintains this email simply showed Sal and Stephen disagreed over the import of a non-self-sealing cap.  (1-ER-35.)

36

8.    <u>BRG-1831/1806</u> (1831 is a 4/30/2012 Metricolor business plan describing its invention as an 'IV-type flexible bag with airtight seal and rubber ring stopper; L'Oréal contends it lacks reference to an alternative design without an airtight seal. 1836 is a business plan from 11/20/2014, also without mentioning a "first generation trade secret system." (1-ER-35.)

Metricolor again acknowledged that most of Metricolor's documents were silent on the first-generation Metricolor System, and focused on the second-generation Metricolor System.  (1-ER-36.)

9.    <u>BRG-</u>1545 (Power Point presentation listing Sal's brother Anthony on Metricolor's "Product Development Team" to assist with business development and marketing.)

L'Oréal argues that in resisting discovery, Metricolor misrepresented to the Court that Anthony had "nothing to do with Metricolor."  Metricolor maintains that when that statement was made, Metricolor's counsel was "unaware" of the document, but the statements were true because while Anthony may have briefly advised on marketing in 2012, he was uninvolved with Metricolor "when the statements were made or at other relevant times."  (1-ER-36-37.)  Metricolor denies intentionally withholding the document and maintains L'Oréal identified no

37

new material information in it given that Sal's brother's brief marketing advice in 2012 played no material role in dealings with L'Oreal starting in 2014.

### d.  The Court's Analysis

Based on the foregoing documents and its prior analysis of documents MC613, 93-94, 43-46 and 47 in its Order of November 16, 2022, regarding L'Oréal's first motion for sanctions, the Court concluded Metricolor's misconduct resulted from "willfulness, bad faith and fault." (1-ER-39-42.)  The Court also said it denied the initial motion for sanctions without prejudice "to have a more developed record." (1-ER-40, citing to 6-ER-760.)

The Court developed its views, as follows: For the initial motion for sanctions, Metricolor relied on Sal's "handwritten field testing notes" (MC88-92) to show Metricolor had tested L'Oréal's samples with their first-generation system. Sal admitted those notes were not contemporaneous, but written years later.  (1-ER-40Also, forensic review of the Cohen Image suggested document MC43-46 was an interview Sal made-up.  These fabrications continued with an alleged summary of interviews with "12 hairstylists."  (1-ER-40

The Court also found that fabricated portions of other documents (MC613, 93-94, 43-46 and 88-92) were too detailed to be "reasonably viewed as a mere attempt by Sal to share information with Metricolor's lawyers." (1-ER-40-41.)

38

The Court concluded "[a]ltogether, the evidence suggests" fabrication of those documents resulted from "willfulness, bad faith, and fault." (1-ER-41.)

As to the Cohen Image, the Court stated plaintiff had concealed the existence of the Image for nearly a year-and-a-half[12] and that forensic expert French concluded thousands of documents were permanently deleted before the Setec Image was created and that Sal was likely the person using the computer.[13] (1-ER-41.) The Court also found Metricolor had tried to withhold documents in the Cohen Image and cancel review of the Image. (1-ER-41.) The reviewed files revealed "at least 280 relevant and responsive documents," including ones challenging Metricolor's "claim that it had developed a first-generation system," or that it "disclosed its alleged trade secret to defendants in its initial presentations," and showed that Sal admitted fabricating evidence and which challenged the "veracity of previously disclosed evidence." (1-ER-41.) The Court then observed plaintiff's opposition argued such documents had limited relevance and may be

---

[12] The underscoring in this section of appellant's brief is supplied by Metricolor for discussion below of the Court's misdirected focus on the timing of when the Cohen Image and its contents were disclosed.

[13] As discussed previously and below, the Court misassumes the Cohen Image should have been earlier disclosed; expert disclosure of Cohen's work process and product was timely. Moreover, neither Metricolor or Metricolor's counsel did not even receive a copy of that image until French provided it. Rather, it was Metricolor's expert, Cohen's, progress work, which work is never revealed by an expert until expert disclosures are due, and even then, only if it forms the basis of his opinions. (*See generally* FRCP 26(a)(2).)

cumulative, without explaining "why it was not obligated to disclose such documents upon their discovery."  (1-ER-41.)

Next, the Court analyzed potential prejudice and concluded L'Oréal had identified fabricated evidence and uncovered permanently deleted documents through French's review of the Cohen Image.  (1-ER-42-43.)  As such, the Court found L'Oréal was deprived of important evidence, "useful for its defense." (1-ER-43.)

The Court then acknowledged "public policy ordinarily favors the disposition of cases on the merits," but said the critical factor was whether "discovery violations make it impossible for a court to be confident that the parties will ever have access to the true facts." (Citing *Connecticut Gen. Life, supra*, 482 F.3d at 1097.)  Here, the Court said, "plaintiff's misconduct . . . cast doubt on the veracity and integrity of all [of the] evidence," such that "fabrication of significant documents" implicated "whether other documents are real."  (1-ER-43.)

The Court also noted the forensic expert found other files were "more likely than not" "overwritten before the Cohen Image was taken" and that "permanently deleted files" would include relevant information."  (1-ER-43-44.)

 The Court concluded plaintiff's conduct made "dismissal with prejudice" "the only appropriate sanction" and that a monetary sanction, excluding evidence or a jury instruction were "insufficient."  (1-ER-44.)

The Court projected a trial would likely conclude the same and that limited documentary evidence existed to support plaintiff's claim of owning a "first-generation trade secret" it shared with L'Oréal. (1-ER-44.)  Here, the Court concluded documents on the Cohen Image "cast significant doubt" on Metricolor's claims in that "contemporaneous meeting notes and business plans" were silent on the "alleged trade secret."  (1-ER-44.)  The Court also found that the "limited evidence suggesting the existence and conveyance of a trade secret" was largely due to Sal's fabrications.  (1-ER-44.)  The Court opined trial would be a futile waste of judicial resources since "no reasonable juror who learned of [Sal's] . . . willful fabrication and deception would credit [his] testimony or evidence." (Case citation omitted.)

## E.  <u>Metricolor's Motion for Reconsideration</u>

### 1.  Metricolor Urges It Should Be Permitted to Speak to the Litigation's Merits

After the Court issued Terminating Sanctions, Metricolor moved for reconsideration, to address evidence the Court had not considered which showed there were not only meetings and communications with L'Oréal that gave it trade secret access, but that the Court's unrelenting focus on an allegation that Sal deleted 50,000 documents was misguided.  (11-ER-1394-1414.)  Metricolor maintained that in fending off L'Oréal's allegations of wrongdoing, it lacked an

41

opportunity to advance its own position, even while it was willing to rely solely on L'Oréal's documents at trial, to prove its claims. (11-ER-1397.) While conceding mishandling of some documents, Metricolor argued that they were not affirmatively used or needed to advance the litigation. (11-ER-1397.) As such, there existed a material difference in fact from what was presented to the Court. (11-ER-1397.)

Using L'Oréal's own documents, Metricolor outlined the involvement and communications of high-ranking L'Oréal personnel which disclosed efforts to misappropriate the Metricolor System. (11-ER-1399-1401.) Illustratively, L'Oréal's President of the Professional Products Division ("Products Division"), Pat Parenty, acknowledged the NDA and that L'Oréal thought Metricolor would need to be paid to go forward with a fee or licensing agreement. (11-ER-1403.) This acknowledgement was in response to a March 10, 2015 email from Scott Schienvar, Vice President of L'Oréal's Products Division which included the following: "I'm looking for some guidance regarding the next steps in defining the relationship we establish with Sal and his son before moving forward . . . *In truth, we don't need Sal or his son…They can give us their supplier contacts and we can go from there' the idea is clear and our innovation team can manage it.* [¶] Mariko wants first to test concept, then, if successful build prototypes through our innovation team." (11-ER-1403.) Schienvar testified he was so high up in L'Oréal

42

USA's corporate hierarchy that only one person stood between him and L'Oréal's CEO, the Chief Operating Officer. (11-ER-1384-1385.) His main "customer" within L'Oréal was the Head of Marketing for L'Oréal brands that included Matrix and Reken—the brands Metricolor accused of misappropriating trade secrets. (11-ER-1388.)

L'Oréal admits Sal and Stephen met with high-level executives of the company at its corporate New York headquarters in late 2014 and in February and November 2015 and, in addition, that three calls occurred between high level executives and Metricolor. (11-ER-1377-1379.)

By April 2015, Schienvar emailed L'Oréal colleague, Mariko Rex, to discuss the Metricolor System and instruct that a brief be prepared summarizing "the product and why we want it, and that no one in L'Oréal is working on anything like it . . .." (11-ER-1372-1373.)

Further, when deposed, Schienvar admitted while he was in product development, other than the Redken and Matix products at issue, L'Oréal had "never launched a product with a syringe." (11-ER-1390-1391.) He also acknowledged that as "head of product development and organization, nobody on [his] team [had] developed a product prior to bonder that used a syringe as a part of the packaging." (11-ER-1391.) Photographs and related material similarly show L'Oréal produced a product with all the salient features of the Metricolor System,

43

which was put into production shortly after Sal and Stephen shared the elements and application of the system with L'Oréal.

### 2. L'Oréal Argued Terminating Sanctions Should Stand

L'Oréal opposed the Motion for Reconsideration as raising no new facts and argued the Court found "no evidence to corroborate that [Metricolor] possessed or disclosed" a first-generation trade secret. (2-ER-68.) L'Oréal also stated the Court's sanctions analysis, by law, avoided close scrutiny of the case's merits. (2-ER-71.) It also cited the Court's Order that Sal had fabricated evidence and failed to produce evidence, "as major as the Cohen Image." (2-ER-76.)

### 3. Metricolor's Reply

Metricolor replied to L'Oreal's Opposition to its Motion for Reconsideration, and argued production mistakes affected less than one percent of the case's documents, which were never used, or needed to advance its allegations. (2-ER-49.) Metricolor also argued reconsideration was warranted given a "material difference in fact . . . from that presented to the Court that, in the exercise of reasonable diligence," "could not have been presented to the Court previously, and based on the Court's Order Granting Motion for Terminating Sanctions (the "Order") manifestly failing to consider material facts presented to the Court at various points." (2-ER-50.) Metricolor argued much evidence was never presented despite its "exercise of reasonable diligence," or that the Court had

seemingly ignored. (2-ER-50.) It also argued it lacked an opportunity to show L'Oréal's evidence alone sufficed for Metricolor to prevail at trial. (2-ER-51.) Here, the Court's failed to consider indisputably authentic and admissible evidence *L'Oréal* had produced that corroborated Metricolor's claims, posed "a material difference in fact" and constituted a manifest "failure to consider material facts" for purposes of reconsideration. (2-ER-53.)

Sal also submitted a declaration supporting reconsideration to respond to material first raised by L'Oréal in its <u>Reply</u> to the Opposition to Terminating Sanctions. Specifically, L'Oréal observed Metricolor had provided no declaration or testimony from Sal "that he did not delete responsive documents or alter his computer as part of a forensic hold." (2-ER-101-103.) Given this new assertion, Metricolor provided Sal's declaration, which included the following:

> "At no point during the litigation did I act with knowledge that my actions would threaten the deletion of records between the time Kevin Cohen imaged my computer and the time L'Oréal's expert imaged my computer. Specifically, I never willfully or intentionally deleted 50,000 files or 'fabricated' evidence . . .."

(2-ER-83.) Although the issue of Sal's lack of a declaration was novel in L'Oréal's Reply, the Court relied on it in terminating the litigation, as follows: Sal failed to attest that "he did not delete responsive documents or alter his computer" after the forensic hold. (1-ER-29.)

45

In its Reply, Metricolor further noted the Court's Order for Terminating Sanctions suggested Metricolor and/or its counsel were complicit in withholding the Cohen Image when it was *never even* in counsel's possession. (2-ER-57.) That is, L'Oréal's allegations became a misplaced part of the Court's thinking.

### 4. The Court Orders Terminating Sanctions

The Court found that even if Metricolor had "an obviously strong case," dismissal was warranted if it "ignored [its] responsibilities to the court in prosecuting the action" to defendant's prejudice. The Court found prejudice because Metricolor had fabricated, destroyed and withheld substantial evidence. (1-ER-17.) The Court denied having ignored material facts and declined to find that L'Oréal had committed significant misconduct to gain an unfair advantage. (1-ER-17.)

The Court further concluded Sal's declaration could not support reconsideration, because it could/should have been filed earlier and did not explain evidentiary fabrication, which significantly affected the Court's decision. (1-ER-18.) The Court also found the declaration had not explained the deleted files or that other potentially relevant files were permanently deleted. (1-ER-18.)

## V.  SUMMARY OF THE ARGUMENT

**A.  <u>Since the Court impermissibly combined alleged discovery missteps of differing natures to enhance the overall severity of sanctions, the Court committed reversible error.  The original discovery abuse involved PPDs and did not forewarn Metricolor that a distinct issue over ESI disclosure would subject it to terminating sanctions.</u>**

**B.  <u>Terminating sanctions were an abuse of discretion because the Court misassumed that Metricolor's forensic expert was required to disclose information gathered from Sal's computer before he disclosed his expert report.</u>**

**C.  <u>Terminating sanctions were an abuse of discretion because Metricolor's allegations were provable based on L'Oréal's documents and admissions alone.</u>**

## VI.  STANDARD OF REVIEW

Abuse of discretion is the standard of review for terminating sanctions, *Connecticut Gen. Life*, *supra,* 482 F.3d at 1096, and for denial of a motion for reconsideration. *Noble v. Wells Fargo Bank, N.A*., 771 Fed. Appx. 378, 379 (9th Cir. 2019) (unpublished), citing *Kerr v. Jewell*, 836 F.3d 1048, 1058 (9th Cir. 2016).  Pursuant to Local Rule of Court, rule 7-18, reconsideration is appropriate

when there is a manifest showing of a failure to consider material facts presented to the Court.

## VII.     ARGUMENT

**A.    <u>The Court Abused Its Discretion in Imposing Terminating Sanctions</u> <u>Based on Two Distinct Forms of Alleged Discovery Abuse — One</u> <u>Relating to PPDs and the Other Based on Expert Disclosure of ESI</u>**

As detailed above and below, L'Oréal requested sanctions for two discrete sets of documents — the Physically-Produced Documents and the ESI documents. As to the PPDs, the Court barred use of documents MC613, 93-94, 43-46 and 47. As to the ESI documents in the Cohen Image, the Court seemed to accept that Metricolor's counsel had not disclosed responsive unproduced documents, and then tried to conceal this by asking to cancel the forensic review.  In fact, as previously noted, Cohen did not make his forensic image available to Metricolor's counsel, who had no reason to think the Cohen and Setec Images might differ and no obligation to disclose its expert's progress work pursuant to Federal Rule of Civil Procedure Rule 26(a)(2).

Nevertheless, the Court then considered the sanctions it previously imposed in relation to the PPDs to find that additional non-disclosure of the Cohen Image warranted terminating sanctions. While courts have broad discretion in meting out discovery-related sanctions, they cannot be cumulative in nature for different

48

wrongs. The law clearly instructs that "[t]o rely on an earlier sanction to justify a later terminating sanction, the sanctioned misconduct must be of the same variety, such that the prior sanction gave clear notice that the failure to comply with a court order could result in a dismissal of the complaint." *Faerfers v. Caviar Creator, Inc.*, 359 Fed. Appx. 739, 741–42 (9th Cir. 2009) ("*Faerfers*"), citing to *United States v. Nat'l Med. Enters.*, 792 F.2d 906, 913 (9th Cir.1986) ("*U.S. v. NME*"). Here, although documents were involved in both the PPDs and the ESI, they were mechanically and substantively different. Concern about the first set was the altering of some clearly relevant PPDs; concern over the latter was unproduced ESI documents in native format, a few of which were relevant and which Metricolor's counsel had not received or reviewed before French delivered counsel a copy of the Cohen Image.

Notably, "[t]he district court may not use earlier incidents of misconduct 'as a fulcrum to elevate the final incident of misconduct to a level that would allow dismissal of the action with prejudice' when the final incident was 'a different kind of misconduct.'" *Faefers*, *supra,* 359 Fed, Appx. at 741-742, citing *U.S. v.* NME, *supra*, 792 F.2d at 913. In that the Court clearly piggybacked and conflated the ESI and PPD issues, even if they each might be "found relevant on the issue of [allegedly] deceptive intent," they did not "constitute a warning of dismissal for what is, in essence, a different kind of misconduct." *Id*. In that the Court "did not

adequately consider lesser sanctions" for two distinct discovery modalities, the Court of Appeals should find the lower court abused its discretion in terminating the litigation with prejudice. *Id*. Indeed, the availability of substantial, but less draconian, sanctions were specifically discussed with the Court as developed below.

**B.** **The Court Abused Its Discretion in Issuing Terminating Sanctions After it Misassumed Cohen Should Have Disclosed Information Gathered from Sal's Computer before He Disclosed His Expert Report**

A terminating sanction is a drastic remedy only for sparing use since it upends a party's fundamental right to a trial and implicates a party's due process rights. As such, discovery sanctions must be commensurate with the alleged harm and should not exceed that which is needed to protect the interests of the party entitled to, but denied, discovery. Moreover, not every delay or omission in producing even relevant documents is "some nefarious malfeasance." *Fisher v. Ciba Specialty Chemicals Corp.*, 2007 WL 987457, at *3 (S.D. Ala. Mar. 30, 2007) ("*Fisher*"). Indeed, such an assumption is misplaced, especially when, as here, the litigation is both technical and sprawling. *See id*. More particularly, the "rules of discovery do not demand perfection, clairvoyance, or miracle workings in the production of documents." *Id*.; *Reinsdorf v. Skechers U.S.A., Inc.*, 296 F.R.D. 604, 615 (C.D. Cal. 2013) ("*Reinsdorf*").

50

This is especially true when an expert, like Cohen, was under no compunction to publicize his work product before his deposition. As the law provides, "[c]rying foul and casting aspersions whenever there's a hole in... document production[] or whenever some small number of documents (even crucial documents) are found relatively late in the process does not advance" the purpose of discovery or the litigation. (*Fisher*, *supra,* 2007 WL 98747, at*3.) The federal rules simply do not require flawless litigation. (*See id*.) This is especially so when, as here, there is a sizable number of documents at issue. (*Moore v. Publicis Groupe*, 287 F.R.D. 182, 191 (S.D.N.Y. 2012); *Freedman v. Weatherford Intern. Ltd.*, 2014 WL 4547039, at *3 (S.D.N.Y. Sept. 12, 2014.)

### 1. Metricolor Timely Disclosed the Cohen Image; No Court Order Required Earlier Disclosure of the Forensic Image of Sal's ESI

As noted above, Metricolor disclosed its rebuttal expert witnesses on February 27, 2023, including Kevin Cohen's name and listing of his report. However, Cohen never conveyed the Cohen Image to Attorney Martorell, or anyone at his firm. Instead, L'Oréal's expert, French, transmitted it to Martorell. Before then, there was <u>no</u> expert evidence that the Cohen and Setec images from Sal's computer would differ and Metricolor's counsel did not suspect such a difference. (9-ER-1291, 1293.)

Metricolor knows of no legal requirement that an expert disclose the material upon which he formulates his opinions <u>before</u> the deadline set for such disclosure, pursuant to Court order or Code (*see* FRCP 26(a)(2)(D).)[14]  Moreover, Cohen did not rely upon the Cohen image in formulating his opinions.  Yet, the Court issued terminating sanctions largely for alleged concealing of the Cohen Image.  This was so even though that image was the work product of Cohen, who disclosed it when deposed in March 2023 and even though that material was not earlier in the possession or control of Metricolor's counsel.  (9-ER-1293.)  The forensic imaging Cohen performed was, by definition, in the course of his developing his expert opinion and therefore not subject to earlier communication to L'Oréal.  Moreover, a party is not ordinarily required to conduct a forensic review of its own systems to identify documents for production in litigation.  *See McKinney*, *supra*, 322 F.R.D. at 249 ("ordering forensic imaging or examination of a computer system or server or other electronic storage device generally requires a very particular showing".)  Here, of course, the Court eventually ordered such disclosure in March 2023 and Metricolor timely complied.  (1-ER-16.)

---

[14]FRCP 26(a)(2)(D) should not be confused with the duty to supplement discovery responses under FRCP 26(e)(1) even after the close of fact discovery. As denoted below, this is precisely what the Court seemed to do.

That the Court was substantially focused on the Cohen Image is clear from its Minute Order of terminating sanctions. It references the Cohen Image **47 times**. (1-ER-11-44.) This includes the following:

- On or about October 8, 2021, plaintiff's expert, Kevin Cohen, created a forensic image of Sal D'Amico's computer . . . but did not disclose its existence to defendants or the Court. (1-ER-15.)

- Neither the Court nor defendants were aware of the existence of the Cohen Image at the time the Setec Image was created. (1-ER-16.)

- In March 2023, defendants learned about the Cohen Image for the first time during an expert deposition of Cohen and subsequently requested a copy of it. (1-ER-16.)

- On March 27, 2023, the Court directed Metricolor to provide French with a copy of the Cohen Image. On April 10, 2023, French received [it]…and made an "initial assessment" that "more than fifty thousand files...on the Cohen Image are not present on the Setec Image." (1-ER-16.)

- The Court directed the parties to conduct a review of the Cohen Image in accordance with the same protocol established for the prior forensic review. Additionally, the Court indicated it would reserve judgment as to defendants' motion for reconsideration of sanctions pending completion of the forensic review of the Cohen Image. (1-ER-17.)

- [T]he issue is whether plaintiff failed to disclose responsive documents upon completing its review of the Cohen Image. (1-ER-34.)

- As a threshold matter, plaintiff concealed the existence of the Cohen Image for nearly a year-and-a-half after its creation. (1-ER-41-42.)

53

- At the hearing, plaintiff's counsel argued that they never 'willfully' withheld documents; rather in some instances they 'didn't find' relevant documents. However, plaintiff did not disclose any of the 5,653 documents *even after completing its review of the Cohen Image.* (1-ER-29.)

This sampling of the Court's comments about the Cohen Image demonstrates the Court misassumed Metricolor's disclosure of that image was untimely. But it is undisputed Metricolor's counsel, while aware Cohen was imaging Sal's computer, <u>never received a copy of the Cohen Image from Cohen</u> and did not suspect its contents differed from that of the Setec Image. (2-ER-155-156.) Whether or not Attorney Martorell had a copy of that image, it was timely disclosed at Cohen's deposition and was his work product until then. Since there was no Court order for earlier disclosure than the regular discovery deadlines, to the extent the Court deemed disclosure of the Cohen Image to be late and violative of disclosure date requirements, the Court abused its discretion.

**2.      To the Extent the Court Viewed the Cohen Image as Belatedly Disclosed Pursuant to the Discovery Code, It Lacked Inherent Authority to Penalize Metricolor**

To the extent the Court found that delayed disclosure of the Cohen Image somehow violated a discovery order, it was barred from exercising its inherent authority to rule on an abuse of such order and would have had to instead make a ruling under FRCP 37. As the Ninth Circuit has held, Rule 37(e) "foreclose[s]

reliance on inherent authority" to determine whether terminating sanctions are appropriate where ESI that should have been preserved was lost. E.g., *Newberry v. Cnty. of San Bernardino*, 750 F. App'x 534, 537 (9th Cir. 2018); *Mfg. Automation and Software Sys., Inc. v. Hughes*, 2018 WL 5914238, at *6 (C.D. Cal. Aug. 20, 2018).

This is relevant to the Court's discussion of the "Destruction of Evidence" in ordering terminating sanctions. (1-ER-28-29.) There, the Court calls out the following: "French identified a subset of 5,653 files that were potentially relevant to this action. *Id.* '[Forty-five percent] of the 5,653 documents . . . were found in unallocated clusters on the Cohen Image, which means they were deleted." (1-ER-28.) French opined this likely occurred during the litigation and included significant documents. (1-ER-28.)

On August 29, 2023, as a precursor to the issuance of terminating sanctions, the Court considered the parties' "cross-motions to vacate or enforce the Court-imposed forensic review"[15] ("Discovery Order"). (3-ER-262.) There, the Court noted FRCP 34 governed the parties' pretrial discovery regarding ["ESI"] and that the rule's aim was to make "relevant and nonprivileged documents," ESI, and

---

[15]In this regard, Metricolor objected to the scope of the forensic review since the review was "expressly limited to identifying files in the Cohen image that had been deleted before Setec created its image." *Id.*, at 7-8. Metricolor also noted some data in the Cohen Image could have been corrupted, not deleted, and through no fault of Metricolor or Cohen. (3-ER-269.)

objects possessed by one party "available to the other." (3-ER-266.) The Court

then overruled Metricolor's objections to production of certain documents,

including grounds that certain files had been deleted. (3-ER-269, 277.)

Hence, the springboard for the Court's eventual issuance of terminating

sanctions derived from its Discovery Order. To the extent that Order and the

deletion of documents evidenced on the Cohen Image became grounds for the

Court's subsequent terminating sanctions, those sanctions should have issued from

a discussion of FRCP 37, and <u>not</u> the Court's inherent authority to dismiss. *Fiteq*

*Inc. v. Venture Corp.*, 2016 WL 1701794, at *1 (N.D. Cal. Apr. 28,

2016) (agreeing that the 2015 Amendment to Rule 37 " 'forecloses reliance on

inherent authority' " when determining sanctions).

### 3. Whether under the Court's Inherent Authority or under FRCP 37, the Cohen Image was Timely Produced, so Terminating Sanctions were an Abuse of Discretion

Dismissal sanctions are only justified in "extreme circumstances" for

"abusive litigation practices, and to insure the orderly administration of justice and

the integrity of the court's orders." *Halaco Engineering Co., v. Costley,* 843 F.2d

376, 380 (9th Cir. 1988). Further, even failing to preserve evidence that

reasonably should have been known to be relevant and potentially subject to

discovery "does not necessarily warrant default or dismissal" when such action

does not **entirely** eclipse the feasibility of a "just result." *In re Napster, Inc. Copyright Litig.*, 462 F. Supp. 2d 1060, 1071 (N.D. Cal. 2006) (emphasis added). This is true even when responsive emails are not disclosed until the close of discovery. (*Id.*)

This is also true when documents potentially relevant to the merits of litigation are destroyed. The question is whether spoliation of documents potentially relevant to a lawsuit's merits renders it impossible for a party to altogether defend itself. As addressed below, the answer here is clearly, "No." L'Oréal's documents and admissions <u>alone</u> adequately frame the allegations and defenses for a meaningful trial even without Metricolor introducing its own documentary evidence. See *Medina v., Boeing Co.*, 2022 WL 599021 at *4 (C.D. Cal. Jan. 27, 2022), <u>appeal dismissed,</u> No. 22-55206, 2022 WL 18956513 (9th Cir. Mar. 25, 2022). Further, as to deleted documents on the Cohen Image, any relevant evidence contained therein was as likely to have helped Metricolor as it was to aid L'Oréal. *Id.* French could not possibly testify to the contrary. At day's end, it is still Metricolor's "burden to prove [its] case." (*Id.*)

Moreover, "[t]erminating sanctions are a severe remedy" to be "imposed only in extreme circumstances." (*Id.,* cited in *Wiersema* v. *Target Corp., et al.*, 2024 WL 4406919, at *10 (C.D. Cal. Aug. 16, 2024.) Such circumstances are absent here, especially since the Court coupled two distinct types of discovery

57

issues—one as to PPDs and the other as to ESI that informed an expert's work product—to terminate the case. L'Oréal failed to show that extreme circumstances warranted termination, and the Court abused its discretion in finding L'Oréal was unable to defend itself based on its own evidence.[16]

Indeed, as discussed below, Metricolor did not need, or intend to use, the documents at issue in the Court's termination decision. Moreover, the Cohen Image documents were not in Metricolor's possession or control until after L'Oréal's own expert had them. There was no willful withholding of such documents and their existence was timely identified by Cohen when deposed. Until then, they were his work product. In sum, to the extent the Court decided to terminate the litigation due to the alleged withholding of the Cohen Image, the Court abused its discretion.

**C.** **The Court Abused Its Discretion in Terminating the Litigation When Lesser Sanctions were Available and Warranted; the Court Should Simply Have Excluded Metricolor's Documentary Evidence and Granted Metricolor's Motion for Reconsideration**

Terminating sanctions and denial of Metricolor's Motion for Reconsideration unjustly denied Appellant its day in court, when the case could

---

[16]As for documents on the Cohen Image, Sal's declaration in support of Metricolor's Motion for Reconsideration underscored he never willfully or intentionally deleted files thereon.

and should have been litigated with L'Oréal's documentary evidence alone, along with whatever admissible testimonial evidence the parties may have introduced. While the Court used the five-fold test enunciated in *Connecticut Gen. Life*[17] to assess whether terminating sanctions should obtain, even that case cautions its framework is not a script for making what the district judge does "appeal-proof." *Connecticut Gen. Life*, *supra*, 482 F.3d 1096. Rather, it simply helps frame a discovery sanction that acknowledges, in part, "the public policy favoring disposition of cases on their merits" and the "availability of less drastic sanctions." *Id*.

Thus, while the court has broad discretion in sanctioning litigants' behavior, sanctions short of case-dispositive discipline usually suffice, especially as here, when discovery violations need not interfere with the rightful decision of the case. *Raygoza v. City of Fresno*, 297 F.R.D. 603, 607 (E.D. Cal. 2014.) While a District Court's conclusion in this regard is afforded great deference, even *Connecticut Gen. Life* is primarily concerned with a just result. Here, justice was denied in a case where an international conglomerate indisputably met with Metricolor and elicited details of the Metricolor System. Even if Metricolor's use of its own documents were suppressed at trial, the trove of L'Oréal's documents and

---

[17] *See* Section IV.C.5, under Statement of the Case.

admissions and the parties' ability to test the credibility of one another's witnesses are more than sufficient for a jury to objectively assess if Metricolor was the victim of breach of contract, misappropriation of trade secrets and unfair competition. Simply put, discovery mistakes do not justify a large conglomerate getting away with brazen trade secret theft for which a jury verdict may have come in at $10-$30 million. Especially given that L'Oreal has a track record of massive trade secret theft against startups.[18] For the reasons stated above and the alternatives argued to the Court, trial should have proceeded, absent a settlement between the parties.

### 1. The Imposition of Terminating Sanctions Requires Restraint

The Court relied on its inherent powers to abort years-old litigation, even though **deposition admissions and L'Oréal's evidence alone** would, at the very least, demonstrate a factual dispute existed over whether L'Oréal misappropriated the Metricolor System. As the Supreme Court has recognized, given their very potency, when, as here, a Court exercises its inherent powers to sanction a party, such powers need be employed with discretion and restraint. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44. This must be all the more so with a lawsuit's outright dismissal.

---

[18] See "L'Oreal owes Olaplex $91 million for stealing trade secrets", Los Angeles Times, August 12, 2019, available at: https://www.latimes.com/business/story/2019-08-12/loreal-owes-olaplex-91-million-for-stealing-trade-secrets. Plaintiff requests that the Court take judicial notice of this article.

A key component of assessing whether a terminating sanction is disproportionately harsh is the risk of prejudice to the party requesting sanctions and the availability of less drastic sanctions. *Compass Bank v. Morris Cerullo World Evangelism*, 104 F. Supp. 3d 1040, 1059 (S.D. Cal. 2015) ("*Compass*"); *Radio City, Inc. v. Celestron Acquisition4., LLC*, 2023 WL 5519324, at *4 (N.D. Cal. Aug. 25, 2023). Even when a court finds a history of recalcitrance in producing relevant discovery, terminating sanctions are only appropriate when lesser sanctions would be ineffectual. *See, Compass*, *supra*, 104 F. Supp. 3d 10 at 1059-1060.

Here, the Court abused its discretion in dismissing the sanctions suggested by Metricolor, especially since the two instances of alleged discovery abuse were not cumulative in nature, but distinct. Further, non-production of the Cohen Image until Cohen's deposition was neither an abuse of a court order nor material secreted by Metricolor's counsel. Some of the documents are tantamount to thinking aloud and were never sent. Other such material would have been subject to exclusion given its irrelevance or because it was more prejudicial than probative. Further, as the Court itself recognized, incompetence 'is not bad faith' and '[s]uch incompetence can include incredibly serious blunders.' *Metricolor, LLC v. L'Oreal USA, Inc.,* 2022 WL 17072006, at *4 (C.D. Cal. Nov. 16, 2022), ("*Metricolor*"), citing *U.S. v. HVI Cat Canyon, Inc., 2015 WL 12766161, at *2 (C.D. Cal. Nov. 20,*

61

2015).  Metricolor did not understand it to be its responsibility to produce the Cohen Image, given the Setec Image; this may have been a blunder, but was not the intentional withholding of ESI since the Cohen and Setec images were not only taken shortly after one another, but because Metricolor's counsel reasonably foresaw no difference between the two images, never received the Cohen Image from Cohen and was willing to abandon its use and use of **all** of Metricolor's documentary evidence to preserve the litigation.  Was non-production of the Cohen Image a blunder?  Perhaps, so, but it was not impermissible gamesmanship. Simply put, the litigation should have been permitted to continue with lesser, alternative sanctions.  The Court abused its discretion in this regard.

## 2. On Metricolor's Motions for Reconsideration, the Court Failed to Consider the Probative Value of L'Oréal's Evidence

The Court's Order for terminating sanctions considered absolutely **no** evidence *produced by L'Oréal*, even when it corroborated Metricolor's allegations. (1-ER-11-44; *see generally*, 11-ER-1400-1412.)  Instead, the Court categorically lumped all the case's evidence into that held by Metricolor.  Despite this, the Court specified that "plaintiff's misconduct has cast doubt on the veracity and integrity of _all_ evidence in this case." (1-ER-43 (emphasis added).) Metricolor's posits that a jury could have found in its favor using only the

admissions and documentary and testimonial evidence produced by L'Oréal and that the Court abused its discretion in ignoring that possibility.

During the Tentative Hearing on the Renewed Motion for Terminating Sanctions, Metricolor's counsel, Attorney Martorell, advocated that a trial could commence on testimony of the parties and the documentary evidence of L'Oréal alone. This included evidence of meetings between Metricolor's principals and high-level L'Oréal executives in New York—two of which meetings were recorded in their long totality word-for-word, numerous emails with L'Oréal, and "hundreds of documents and thousands of pages" exchanged between the parties. (9-ER-1276-1277.)

Hence, Metricolor's case could rely simply on L'Oréal's own documentation and testimony – which cannot be challenged by L'Oréal as inauthentic – and still prove up its case for trade secret misappropriation. (9-ER-1277.)

Further, as Metricolor reminded the Court, it never used the questionable documents to further its case and did not need them since L'Oréal's own documents would suffice. (9-ER-1277, 1279.) As detailed above, this issue was again broached in Metricolor's Motion for Reconsideration. Additionally, Metricolor urged that monetary sanctions could still be imposed if a trial did not dissuade the Court to the contrary. (9-ER-1279.)

As Metricolor also emphasized, discovery errors sometimes unwittingly occur. As the case of *Reinsdorf, supra,* 296 F.R.D. at 614 notes, "while parties must impose a reasonable construction on discovery requests and conduct a reasonable search when responding to the requests, the Federal Rules do not demand perfection." Further, "it is improper to infer nefarious intent or bad faith' from 'ordinary discovery errors." (*PaineWebber Group, Inc. v. Zinsmeyer Trusts Partnership*, 187 F.3d 988, 993 (8th Cir., 1999). As Mr. Martorell continued, a party should not cry foul or cast aspersions, "whenever some small number of documents (even crucial documents) 'are found relatively late in the process.'" (9-ER-1280), quoting *Reinsdorf*, supra, 296 F.R.D. at 615.

As to Sal's computer, he truthfully represented his computer had died. The recovered documents were instead recovered from the hard drive. (9-ER-1282.) Attorney Martorell also argued that a jury should assess whether fraud existed and whether a case could be had based on the concessions and evidence of L'Oréal alone.[19] He further noted issues with relying on the "last accessed" dates from the Cohen Image which French examined. (9-ER-1284-1285.) Indeed, the Court misrelied on last access dates that were not even listed on French's own production

---

[19]As previously noted, the evidence demonstrates L'Oréal USA's upper echelon was involved with Metricolor's trade secrets. Illustratively, Scott Schienvar, Vice President of Operations in the Professional Products Division was pressured to help realize strategically important bonder products and to move the Matrix and Redken brands towards use of the Metricolor process. (11-ER-1464-1467.)

log. (9-ER-1285-1286.) In sum, Martorell urged L'Oréal's own evidence demonstrated L'Oréal and Metricolor had met several times, followed by the release of a product nearly identical to that of Metricolor's. (9-ER-1286.)

As to non-production of Cohen's file, Martorell reiterated production <u>was</u> timely for expert disclosures, and he anticipated the Cohen and Setec Images would not significantly differ. (9-ER-1291, 1293.) Further, he questioned whether any proof existed of actual deletion of relevant documents. (9-ER-1291.)

Metricolor maintains that the Court's single-minded focus on the Cohen Image and a relatively slim number of documents – few of which were used or communicated to L'Oréal – snatched away a case of alleged trade secret theft that should have been put to a jury, rather than peremptorily extinguished. This is especially so, when the Court itself recognized in its earlier ruling on the exclusion of the PPDs as direct evidence, that in proving trade secret misappropriation, "plaintiffs [often] must construct a web of perhaps ambiguous circumstantial evidence from which the [trier-of-fact] may draw inferences which convince him that it is more probable than not that what plaintiffs allege happened did in fact take place." *Metricolor*, 2022 WL 17072006, at *10 (C.D. Cal. Nov. 16, 2022), citing *Greenberg v. Croydon Plastics Co.*, 378 F. Supp. 806, 814 (E.D. Penn. June 17, 1974). Given the unequivocally serious allegations here, justice was clearly disserved.

**3. In Ruling on Metricolor's Motion for Reconsideration, the Court Singularly Focused on Metricolor's Missteps Regarding the Non-Production of Documents that a Jury Did Not Require to Fairly Evaluate the Case**

In ruling on Metricolor's Motion for Reconsideration of its terminating sanction, the Court found that even assuming Metricolor had "an obviously strong case," dismissal was warranted if it had "clearly ignored [its] responsibilities to the court in prosecuting the action" to the prejudice of defendant. The court concluded there was prejudice because Metricolor had fabricated, destroyed and withheld substantial evidence. (1-ER-8.) This, of course, was a circular argument. Once the Court concluded the Cohen Image should earlier have been produced, Metricolor had somehow offended the rules of discovery, even though that image was timely disclosed. Further, Metricolor never used, and would not have used, that trove of documents, including at trial, even while the Court could have permitted L'Oréal to introduce such documents at trial. Metricolor's counsel encouraged this and was willing to rely solely on the documents L'Oréal introduced and the admissions of its officers.

Indeed, as detailed above, in the Opposition to L'Oréal's Motion for Summary Judgment and as presented in Metricolor's Motion for Reconsideration, L'Oréal's personnel made self-incriminating admissions that showed L'Oréal had

the incentive and the wherewithal to monetarize Metricolor's trade secrets. Metricolor needed no more evidence than this to advance a compelling case to the jury. Instead, L'Oréal was allowed to misappropriate information that will earn it a handsome, unearned return on the innovation of Metricolor's principals. This is hardly justice. Indeed, lost in L'Oréal's narrative and the Court's ruling in terminating the case is the temporal proximity to discussions had between the parties and the launching of L'Oréal's new hair coloring products.

Metricolor maintains the Court abused its discretion by impermissibly melding two distinct types of alleged discovery abuse into one and concluding that together they provided a foundation for terminating sanctions. The result is an injustice the law does not intend. Accordingly, the Court's ruling of terminating sanctions should be reversed.

## VIII.     CONCLUSION

For all of the foregoing reasons, Metricolor respectfully maintains the Court abused its discretion in issuing terminating sanctions and that the case should be restored.

Dated: November 20, 2024          Respectfully submitted,

**MARTORELL LAW APC**

By: s/ Eduardo Martorell
         Eduardo Martorell
         JoAnn Victor
         *Attorneys for Plaintiff/Appellant*
         METRICOLOR LLC

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT
## Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form17instructions.pdf*

**9th Cir. Case Number(s)** | 24-3747

The undersigned attorney or self-represented party states the following:

( • ) I am unaware of any related cases currently pending in this court.

( ) I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

( ) I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

**Signature** | s/ Eduardo Martorell          **Date** | Nov 20, 2024

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 17**                                                                 *New 12/01/2018*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** 24-3747

I am the attorney or self-represented party.

**This brief contains** 13,191 **words,** including 0 words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◉ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

○ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
  ☐ it is a joint brief submitted by separately represented parties.
  ☐ a party or parties are filing a single brief in response to multiple briefs.
  ☐ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated _____.

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/ Eduardo Martorell **Date** November 20, 2024

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8** *Rev. 12/01/22*