No. 24-3747

IN THE

# United States Court of Appeals for the Ninth Circuit

METRICOLOR LLC,

*Plaintiff-Appellant,*

*v.*

L'ORÉAL USA, INC.; L'ORÉAL USA PRODUCTS, INC.;
L'ORÉAL USA S/D INC.; REDKEN 5TH AVENUE NYC, LLC,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Central District of California
No. 2:18-cv-00364-CAS-E
Hon. Christina A. Snyder

## RESPONSE BRIEF FOR APPELLEES

William Oxley
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
355 S. Grand Avenue
Los Angeles, CA 90071

Lauren A. Weber
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
401 Union Street
Suite 3300
Seattle, WA 98101

Naomi J. Scotten
Angela Colt
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
51 West 52nd Street
New York, NY 10019
(212) 506-5000

*Counsel for L'Oréal USA, Inc.; L'Oréal USA Products, Inc.; L'Oréal USA
S/D Inc.; Redken 5th Avenue NYC, LLC*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Defendants-Appellees L'Oréal USA, Inc.; L'Oréal USA Products, Inc.; L'Oréal USA S/D Inc.; and Redken 5th Avenue NYC, LLC disclose that L'Oréal S.A. is the parent company of L'Oréal USA, Inc.; L'Oréal USA Products, Inc.; and L'Oréal USA S/D Inc. Redken 5th Avenue NYC, LLC no longer exists; it was merged into L'Oréal USA, Inc. Nestlé S.A. owns more than 10% of L'Oréal S.A.'s stock.

Date: February 19, 2025    ORRICK, HERRINGTON & SUTCLIFFE LLP

*/s/ Naomi J. Scotten*
Naomi J. Scotten
*Counsel for Defendants-Appellees*

i

# TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENT ........................................... i

TABLE OF AUTHORITIES ............................................................... iv

INTRODUCTION ........................................................................... 1

JURISDICTIONAL STATEMENT .................................................... 3

STATEMENT OF THE ISSUES ....................................................... 3

STATEMENT OF THE CASE ......................................................... 3

    L'Oréal invents a syringe-based system for hair-dye
        extraction ........................................................................ 3

    Metricolor's founder patents a similar system. ............................. 4

    L'Oréal and Metricolor discuss the Metricolor System ................. 5

    Metricolor sues, alleging patent infringement and theft of
        trade secrets related to its patent ........................................ 7

    Metricolor amends the complaint to drop its patent-related
        claims and allege theft of previously unmentioned
        trade secrets. .................................................................. 8

    A forensic review demonstrates that Metricolor fabricated
        helpful documents to bolster its new theory. ...................... 10

    The district court initially declines to grant terminating
        sanctions but warns Metricolor that its case is at risk. ....... 18

    A second forensic review reveals that Metricolor deleted and
        withheld documents after filing suit. ................................. 19

    Metricolor withholds relevant documents recovered during
        the forensic review, and tries to stop the review ................. 22

    The district court grants terminating sanctions, finding that
        Metricolor committed grave discovery abuses. ................... 27

    The district court denies reconsideration. ................................. 30

SUMMARY OF THE ARGUMENT ..................................................... 31

STANDARD OF REVIEW ................................................................. 32

ARGUMENT ............................................................................. 33

I.   The District Court Acted Well Within Its Discretion In Awarding Terminating Sanctions For Metricolor's Severe Misconduct. ............................................................ 34

     A.   The district court's findings supported an award of terminating sanctions. ........................... 36

     B.   The district court correctly rejected lesser sanctions........................................................ 43

          1.   The district court properly considered and rejected lesser sanctions. ................................ 43

          2.   Metricolor's arguments ignore the seriousness of its discovery violations. .............. 46

          3.   The supposed merits of Metricolor's case have no bearing on the sanctions analysis........ 51

II.  The District Court Sanctioned Metricolor For Fabricating, Destroying, And Withholding Evidence, Not For Failing To Disclose The Cohen Image. .................. 54

     A.   The district court did not abuse its discretion by discussing the Cohen Image. ..................... 55

     B.   The district court made the findings necessary to sanction Metricolor for destroying evidence under Rule 37(e). ................................................................ 61

III. The District Court Had No Obligation To Silo Metricolor's Related Misdeeds From Each Other. ............. 65

CONCLUSION ...................................................................... 70

STATEMENT OF RELATED CASES

CERTIFICATE OF COMPLIANCE

iii

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adriana Int'l Corp. v. Thoeren*,
913 F.2d 1406 (9th Cir. 1990) .................................................. 45, 66, 67

*Advanced Display Sys. v. Kent State Univ.*,
212 F.3d 1272 (Fed. Cir. 2000) ......................................................... 60

*Anderson v. Air West, Inc.*,
542 F.2d 522 (9th Cir. 1976) ........................................................ 51, 52

*Anheuser-Busch, Inc. v. Nat. Beverage Distribs.*,
69 F.3d 337 (9th Cir. 1995) .............. 2, 33, 34, 34, 35, 37, 41, 44, 48, 54

*Berman v. Freedom Fin. Network, LLC*,
30 F.4th 849 (9th Cir. 2022) ............................................................... 33

*Combs v. Rockwell Int'l Corp.*,
927 F.2d 486 (9th Cir. 1991) .............................................................. 65

*Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*,
482 F.3d 1091 (9th Cir. 2007) .................... 32, 34, 40, 43, 45, 46, 49, 54

*Faerfers v. Caviar Creator, Inc.*,
No. 04-cv-02690, 2008 WL 1970325 (E.D. Cal. May 2, 2008) ........... 68

*Faerfers v. Caviar Creator, Inc.*,
359 F. App'x 739 (9th Cir. 2009) ....................................................... 67

*Greenwood v. FAA*,
28 F.3d 971 (9th Cir. 1994) ..................................................... 35, 37, 41

*Halaco Eng'g Co. v. Costle*,
843 F.2d 376 (9th Cir. 1988) .............................................................. 50

*Jones v. Riot Hosp. Grp. LLC*,
95 F.4th 730 (9th Cir. 2024) ............................ 34, 36, 42, 44, 48, 49, 63

*Leon v. IDX Sys. Corp.*,
  464 F.3d 951 (9th Cir. 2006) ............... 33, 36, 41, 42, 43, 44, 45, 52, 54

*Malone v. USPS*,
  833 F.2d 128 (9th Cir. 1987) ........................................................... 52

*Medina v. Boeing Co.*,
  No. 20-cv-00304, 2022 WL 599021 (C.D. Cal. Jan. 27,
  2022) .................................................................................... 47, 48

*Metricolor LLC v. L'Oréal S.A.*,
  791 F. App'x 183 (Fed. Cir. 2019) ................................................. 7, 8

*In re Napster, Inc. Copyright Litig.*,
  462 F. Supp. 2d 1060 (N.D. Cal. 2006) ............................................ 50

*O'Guinn v. Lovelock*,
  502 F.3d 1056 (9th Cir. 2007) ............................................. 53, 62, 66

*Olaplex, Inc. v. L'Oréal USA, Inc.*,
  855 F. App'x 701 (Fed. Cir. 2021) ...................................................... 47

*PaineWebber Grp. v. Zinsmeyer Trs. P'shp*,
  187 F.3d 988 (8th Cir. 1999) ............................................................ 39

*In re Phenylpropanolamine (PPA) Prods. Liab. Litig.*,
  460 F.3d 1217 (9th Cir. 2006) ......................................................... 43

*Raygoza v. City of Fresno*,
  297 F.R.D. 603 (E.D. Cal. 2014) ...................................................... 50

*United States v. Nat'l Med. Enters.*,
  792 F.2d 906 (9th Cir. 1986) .......................................................... 67

*United States v. Richey*,
  632 F.3d 559 (9th Cir. 2011) ........................................................... 60

## Statutes & Rules

28 U.S.C. § 1291 ................................................................................. 3

28 U.S.C. § 1331 ................................................................................. 3

v

28 U.S.C. § 1367 ......................................................................... 3

28 U.S.C. § 2111 ...................................................................... 65

Fed. R. Civ. P. 26 .................................................................... 23

Fed. R. Civ. P. 26(e) ............................................................... 59

Fed. R. Civ. P. 37(e) ............................... 55, 61, 62, 63, 64, 65

Fed. R. Civ. P. 37(e)(2) ........................................................ 63

# INTRODUCTION

In this trade-secret-misappropriation case, Metricolor's co-founder used scissors, tape, and a copier to construct a fake email backdated to years earlier. This was one of several key documents he fabricated. He also deleted thousands of potentially relevant documents from his computer, destroying some permanently. And when a forensic review uncovered those files, Metricolor wrongly withheld hundreds of them for months. Those documents turned out to be some of the most significant documents in the case.

The fabricated documents appeared to support Metricolor's false claims that it had disclosed trade secrets to L'Oréal. For example, Metricolor altered a real email in which it refused to send samples to L'Oréal, creating a fake version of the email agreeing to do so. The withheld documents, on the other hand, dismantled Metricolor's claims. In one withheld email, for instance, the co-founder proclaimed that he would tell L'Oréal "total bullshit and a lie" to sell Metricolor's product. 3-SER-569.

Faced with this array of bad-faith discovery abuses, the district court acted well within its discretion in dismissing the case to sanction

1

Metricolor. This Court has long recognized that district courts may grant terminating sanctions when "a party has engaged deliberately in deceptive practices that undermine the integrity of judicial proceedings." *Anheuser-Busch, Inc. v. Nat. Beverage Distribs.*, 69 F.3d 337, 348 (9th Cir. 1995). Here, the district court found that Metricolor's intentional misconduct "cast doubt on the veracity and integrity of all evidence in this case," making it "futile" to hold a trial. 1-ER-43-44.

Metricolor has little to say about the district court's factual findings or its assessment of the factors for granting terminating sanctions. Instead, Metricolor raises a series of arguments that distort the law and the record. One argument boils down to an assertion that Metricolor should barely be punished for its egregious misconduct. Another pretends that, by sanctioning Metricolor for destroying and withholding relevant documents, the district court somehow invented new requirements for expert disclosure. And a third contends that the district court erred by considering the various discovery abuses together, merely because Metricolor produced some documents as scanned PDFs while destroying others in their native electronic form.

This Court should affirm the district court's judgment.

2

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1367. The district court dismissed Metricolor's amended complaint with prejudice on March 29, 2024, and entered judgment for L'Oréal on June 28, 2024. 1-ER-44; 1-SER-2-3. Metricolor filed its notice of appeal on June 13, 2024. 10-ER-1297-98. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1. Whether the district court acted within its discretion by finding that lesser sanctions could not rectify Metricolor's discovery abuses, and dismissing this case to sanction Metricolor for fabricating, destroying, and withholding evidence.

2. Whether the district court acted within its discretion by discussing a forensic image that documented Metricolor's deletion and withholding of evidence, and which Metricolor kept secret for years.

3. Whether the district court acted within its discretion by considering Metricolor's related discovery abuses collectively.

## STATEMENT OF THE CASE

### *L'Oréal invents a syringe-based system for hair-dye extraction.*

L'Oréal is a leader in the haircare industry. As part of its

3

business, it manufactures and sells hair dye and other hair treatments to salons. *E.g.*, 8-ER-1140-41. When applying a treatment, a stylist must combine components such as coloring "agents and additives" in different ratios for each client, depending on the desired characteristics of the final result. *See* 8-ER-1130-31. For example, achieving a dark-brown hue might require using more of one component than is necessary to create a light-brown hue.

In 2013, L'Oréal filed a patent application for a system designed to improve "the packaging, withdrawing, and dispensing" of hair-coloring products. 2-SER-479-81. This system involved using syringes to extract hair-coloring products from air-tight pouches, thus enabling users to "withdraw the desired quantity thereof in a clean, precise, and conservative manner." 2-SER-479; *see also* 2-SER-491. L'Oréal's application was published in April 2014. 2-SER-477.

**Metricolor's founder patents a similar system.**

Stephen D'Amico, a hairstylist, founded Metricolor with his father, Sal D'Amico. 8-ER-1126. As part of his work for Metricolor, Stephen patented a system for storing and extracting hair dye similar to the system claimed in L'Oréal's 2013 patent application. *See* 8-ER-

4

1133-34. In January 2013, Stephen filed an application for what later became United States Patent No. 9,301,587 (the '587 patent). 8-ER-1164. No form of that application became public until July 2014, 8-ER-1164—months after L'Oréal's application was published, 2-SER-477. Metricolor's '587 patent issued in April 2016. 8-ER-1164.

Like L'Oréal's application, the '587 patent claims a system where a container for hair dye has an "air-tight reclosing seal" that allows a syringe to extract dye from an "air-tight chamber" in a pouch. 8-ER-1164; *see also* 8-ER-1175-78. Metricolor calls this system the "Metricolor System." 2-SER-511. Stephen and Sal assigned their rights in the Metricolor System to Metricolor in 2016. 8-ER-1127 n.1.

### L'Oréal and Metricolor discuss the Metricolor System.

The D'Amicos first contacted L'Oréal in July 2014 to discuss the Metricolor System. 6-ER-748. Both Sal and Stephen signed mutual non-disclosure agreements (NDAs) with L'Oréal in August 2014. 6-ER-748. Between October 2014 and November 2015, the D'Amicos and L'Oréal had four meetings and calls, plus various email exchanges, regarding L'Oréal's potential interest in the Metricolor System. 6-ER-748-49. But when L'Oréal asked Sal in March 2016 for exclusivity

5

rights to evaluate the Metricolor System, and for samples of the system, Sal refused to send samples without a concrete offer: "[Y]our request to have our packages filled with your formulas will not be possible at the present time." 6-ER-749. L'Oréal ended discussions about the Metricolor System in June 2016. 6-ER-749.

L'Oréal subsequently launched two new products: Matrix Bond Ultim8 and Redken pH-Bonder. 6-ER-749. These products used "a standard orifice reducer and Comar 10mL catheter syringe." 6-ER-749. An "orifice reducer" is an insert in a bottle's opening that decreases the opening's size, allowing for controlled release of the bottle's contents. Typical squeeze bottles of shampoo and conditioner have standard orifice reducers, for example. Unlike Metricolor's patented system, standard orifice reducers are not airtight. *See, e.g.*, 1-ER-13.

Whereas Metricolor's patented system placed its airtight orifice reducers in pouches, L'Oréal put its standard orifice reducers in plastic bottles. 6-ER-749. Many of L'Oréal's other products had used plastic bottles with standard orifice reducers since at least January 2014. *See* 1-SER-141-44. And by the time L'Oréal released its new products in September 2016, L'Oréal had used Comar as a supplier for years, since

6

at least February 2014.  1-SER-117.

### *Metricolor sues, alleging patent infringement and theft of trade secrets related to its patent.*

In January 2018, Metricolor sued L'Oréal and alleged, among other things, that Matrix Bond Ultim8 and Redken pH-Bonder infringed Metricolor's '587 patent—the system with the airtight seal— and that L'Oréal stole Metricolor's trade secrets related to that patented system.[1]  The district court dismissed the complaint for failure to state a claim.  2-SER-496-505.

On appeal, the Federal Circuit agreed that Metricolor failed to state any viable claims.  As relevant here, the Federal Circuit held that the complaint did not plead a claim for infringement because Metricolor "did not identify any 'air-tight' seal" in the accused products.  *Metricolor LLC v. L'Oréal S.A.*, 791 F. App'x 183, 188 (Fed. Cir. 2019)  In fact, one of L'Oréal's products pictured in the complaint "ha[d] an 'open hole at the base of the bottle,' plainly contradicting [Metricolor's] allegation of

---

[1] Metricolor sued five L'Oréal entities: L'Oréal S.A.; L'Oréal USA, Inc.; L'Oréal USA Products, Inc.; L'Oréal USA S/D, Inc.; and Redken 5th Avenue NYC LLC.  2-SER-506-07.  The district court dismissed L'Oréal S.A., the French parent company, for lack of personal jurisdiction.  2-SER-499-500.  This brief refers to the remaining entities collectively as "L'Oréal."

an 'air-tight' seal." *Id.*

As for the claim of trade-secret theft, Metricolor failed to allege "any misuse of confidential information beyond what was already disclosed in the published '587 patent application." *Id.* In other words, the alleged "trade secrets" were all public information that did not qualify as trade secrets. *Id.* The Federal Circuit remanded for the district court to consider whether to allow Metricolor to amend the complaint. *Id.* at 190.

### *Metricolor amends the complaint to drop its patent-related claims and allege theft of previously unmentioned trade secrets.*

On remand, the district court allowed Metricolor to amend its complaint. 8-ER-1223. Metricolor then abandoned its patent-related claims and rebuilt its case around purported trade secrets that did not appear anywhere in the original complaint.[2]

In the amended complaint, filed in March 2020, Metricolor now alleged that it possessed trade secrets in a version of the Metricolor System "not described or claimed" in any patent. 8-ER-1134, 8-ER-1149. According to Metricolor, the original complaint—about the '587

---

[2] Because Metricolor dropped its claim for infringement, L'Oréal did not have an opportunity to challenge the '587 patent's validity.

patent—addressed its "second-generation system," which includes a "pouch," a "self-sealing orifice reducer" (i.e., an airtight orifice reducer), and a "syringe." 6-ER-775.

Metricolor now asserted that L'Oréal had stolen a different (never-before-mentioned) trade-secret: a "first-generation system." *See* 6-ER-775. According to Metricolor, this first-generation system includes "an ordinary plastic bottle" (not a pouch), an "off-the-shelf" standard orifice reducer (not an airtight one), and a 10 mL catheter syringe. 1-SER-205-07. As part of this "first-generation" system, Metricolor also claimed that it possessed a trade secret in the identity of Comar—L'Oréal's preexisting supplier—as Metricolor's supplier for syringes and standard orifice reducers. 1-SER-209. In other words, after Metricolor failed to show that L'Oréal's products infringed its patented system, Metricolor turned around and claimed that the exact same products misappropriated different, unpatented trade secrets—ones Metricolor never previously identified or alleged that it disclosed to L'Oréal.

According to Metricolor, L'Oréal violated both federal and California laws by misappropriating those supposed trade secrets. 8-ER-1149-60. And Metricolor alleged that L'Oréal breached the parties'

9

NDA by using confidential information to add elements of the

Metricolor System to its own products.  8-ER-1145-49.

### *A forensic review demonstrates that Metricolor fabricated helpful documents to bolster its new theory.*

During discovery, Metricolor produced several documents that

appeared to support its claims that it had conceived of a first-generation

system and disclosed that system to L'Oréal.  But L'Oréal began to

suspect that these documents were not authentic.

The fraud started to unravel during the August 2021 deposition of

a former L'Oréal employee.  L'Oréal's counsel asked the former

employee about an email chain that Metricolor produced.  In this email

exchange, the former employee asked Sal to send samples of the

Metricolor System.  2-SER-264.  In a response that Sal appeared to

have sent in March 2016, Sal agreed to send the requested samples:

> [O]ur current prototype consists of only 10 containers, two types of
> orifice reducers (*standard with hole* and self-closing) and two
> catheter syringes we use (small *10 ml* from our new supplier,
> *COMAR* and a large Toomey catheter syringe), depending on the
> several weeks for our manufacturer to produce.  In the meantime,
> *I can send to you* only one of the 10 prototypes and two types of
> sample orifice reducers and syringes to your address below.

2-SER-263-64 (emphasis added).  This email conflicted with another

version of the email produced in discovery, in which Sal declined to send

10

the samples. *See* 1-ER-21. And it was a treasure trove for Metricolor. It provided clear evidence that Metricolor disclosed to L'Oréal elements of its first-generation system: the "standard" (i.e., non-airtight) orifice reducer and the 10 ml Comar syringe.

In reality, none of this happened. L'Oréal's former employee testified that she did not remember this email and never received samples from Metricolor. 1-SER-156. L'Oréal confronted Sal with the obvious discrepancy at his deposition the next month. Rather than coming clean, Sal hedged. He asserted that he "wrote" the email "in 2016," but claimed he "may not have sent" it and "d[idn't] remember" whether "it was sent or was not sent." 1-SER-172-75. In other words, Sal suggested that the email might have been sent or might have just been sitting in his drafts folder for years.

L'Oréal pressed Sal about another discrepancy at his deposition. Metricolor had produced a document purportedly reflecting its "[f]ield [t]esting" of L'Oréal's products with a non-airtight orifice reducer (i.e., the "first-generation" orifice reducer). 2-SER-346-48. Sal equivocated about whether he had created the document before or after litigation started. 1-SER-178. But he maintained that he was "pretty sure we

11

distributed that to L'Oréal at one of their meetings." 1-SER-181.

Sal's testimony raised red flags for L'Oréal. Within a few days of the deposition, L'Oréal told Metricolor that Sal "appear[ed] to have fabricated evidence" after the case began. 1-ER-15. In October 2021, L'Oréal asked the district court to order a forensic analysis of Sal's computer to see what metadata remained for certain documents purporting to be from the 2014-2016 timeframe. 1-ER-15.

In November 2021, the district court granted L'Oréal's request. 1-ER-16. The parties stipulated to a "forensic inspection protocol" pursuant to which L'Oréal would pay for an e-discovery vendor to use "specialized software to collect all accessible active, deleted and system data" from Sal's computer, thus creating a "forensic image" of the computer. 7-ER-923-27. Another vendor would then run other specialized software to interpret the data. 7-ER-928. The district court limited the scope of this review to 14 documents that L'Oréal suspected Sal had fabricated. *See* 7-ER-925.

In December 2021, on the district court's order, Setec Investigations took a forensic image of Sal's computer. 1-ER-16. Subsequent forensic review of the Setec Image confirmed that, *after*

12

Metricolor filed its amended complaint, Sal fabricated four key documents—creating some from scratch, and altering other preexisting documents, mainly by adding references to Metricolor's new trade-secret theories. *See* 8-ER-751-58; 1-SER-253-61 (declaration from L'Oréal's forensic expert). Metricolor produced all of these fabricated documents during discovery. The fabricated documents were as follows:

*First*, **Sal's fake March 2016 email**.[3] Sal physically constructed this email in March 2020—mere weeks after Metricolor filed its amended complaint—using scissors, tape, and a copy machine. 1-ER-21-22. Sal started with a real email chain where L'Oréal had requested Metricolor's samples. But in the real email chain, Sal refused to send samples, telling L'Oréal: "[Y]our request to have our packages filled with your formulas will not be possible at the present time." 2-SER-269. He also said nothing about any first-generation system, referring instead to Metricolor's "patented technology." *See* 2-SER-273-74 (redline comparison of the fabricated and original emails).

That response did not help Metricolor's case. To prevail here, it

---

[3] The district court's decision and Metricolor's opening brief refer to these documents by their Bates numbers. For ease of reference, we include those numbers in footnotes—here, MC613 for the email.

13

would need to have possessed and disclosed a first-generation trade secret to L'Oréal. So Sal crafted a fake response. As discussed above, the fake email—the one that alerted L'Oréal to fabrication issues in the first place—reflected that Metricolor *agreed* to send the requested samples. *Supra* 10. The fake email also included conspicuous references to purported aspects of the first-generation system, like Comar syringes and standard orifice reducers. *Id.* Sal printed the fake email, cut it out, taped it over the body of his real email, and processed the fake through a copy machine to make it look authentic. 1-ER-21-22; *see also* 6-ER-788.

***Second,*** **fake 2014 field-testing results**.[4] Metricolor produced results of product field-testing and packaging costs altered to falsely represent that Metricolor had tested a first-generation system in 2014.

The real document was undated, and it described field testing of various products. 1-ER-23. But in November 2020, Sal added an October 2014 date to the document's header. 1-ER-23. And he altered the original to plug in references to testing results and costs for using standard (non-airtight) orifice reducers, which the original document

---

[4] MC93-94.

14

did not mention at all. *See* 2-SER-355-57 (redline comparison of the fabricated and original documents). As discussed above, standard orifice reducers were purportedly part of the first-generation system. Sal had thus altered the document to make it seem as if Metricolor had a first-generation system at the time of its 2014 meetings with L'Oréal, which would have supported its claim that it told L'Oréal about aspects of that system.

*Third*, *fake 2015 results of a survey of hair salons about inaccuracy and waste in hair-coloring methods*.[5] This document proclaimed in its header that Metricolor "[p]resented R&D results to L'Oréal/Matrix DMI Team in NYC" in November 2015. 2-SER-403-06. These in-depth survey "results" from a "qualitative research study" went on for four pages. They indicated, among other things, that most salon owners felt that their current hair-coloring systems resulted in a lot of wasted product, and that "87% of salon owners" would be "very interested" in a new system "with a new packaging format," 2-SER-404-05—something like the Metricolor System, for example. But the forensic review revealed that Sal first created this survey document

---

[5] MC43-46.

15

between April 2016 and January 2017, "months after Metricolor's meetings with L'Oréal ended."  1-ER-25.  Sal then altered the document in December 2020 by adding the November 2015 date, along with the prominent note about presenting the survey results to L'Oréal at a meeting.  1-ER-25-26; *see also 2*-SER-414-25 (redline comparison showing Sal's additions).

**Fourth, fake price quotes for the first-generation system.**[6] Sal created this document from whole cloth.  It purported to show "actual packaging costs quotes" from Metricolor's suppliers for its "[f]irst-generation prototype" and for traditional "[t]ube [p]ackaging."  2-SER-454-55.  The document was detailed.  It reflected that the prototype—with a "poly-plastic container and standard orifice reducer and syringe"—would cost a mere $.06 per 8-ounce unit, against $.64 for the tube packaging.  2-SER-455.  But Sal did not create this document until 2020, after Metricolor amended the complaint.  1-ER-26; *see also* 6-ER-806.  This fake document was the only document in Metricolor's production that expressly mentioned the "first-generation prototype" and listed all the prototype's various components.  1-ER-26-27.

---

[6] MC47.

16

Metricolor claimed that it produced all of these fabricated documents by mistake. According to Metricolor, Sal intended to use the documents only to share notes with his lawyers about his recollections. *E.g.*, 6-ER-753-54, 6-ER-756-58. For instance, Metricolor insisted that the fake field-testing results reflected Sal's contemporaneous "handwritten notes" about the testing, which he later typed up and then revised to include "other information that Stephen had told [L'Oréal] by phone."[7] 6-ER-792. But Sal later admitted that those handwritten notes "were not contemporaneous but rather were written years later as well." 1-ER-40.

Metricolor also maintained that Sal's fake email about sending samples "reconstruct[ed] an email he thought he had sent to a L'Oréal employee in 2016." 6-ER-788. Sal claimed that he reconstructed the email just for his lawyers' "internal use." *Id.* But Metricolor could not explain why Sal went to great lengths to forge an authentic-looking email when Sal's usual practice for communicating with his lawyers involved adding "little stickums and little Post-it Notes" to documents. 1-SER-37-38.

---

[7] The notes have a Bates number of MC88-92.

17

Metricolor also withheld key information about Sal's spoliation from the district court. Sal told Metricolor's counsel by October 15, 2021, that he "cut + pasted + printed" this fake email "during the litigation" and "had not sent" it. 6-ER-791; *see also* 6-ER-804. Yet 11 days after Sal's admission to Metricolor's counsel, Metricolor falsely represented to the district court that Sal "d[id] not remember if the email in question was sent or not." 2-SER-476; *see also* 1-ER-21 (district court discussing Metricolor's dishonesty). Metricolor made this false statement in an opposition seeking to prevent spoliation-related delay in the case schedule. *See* 2-SER-468.

### *The district court initially declines to grant terminating sanctions but warns Metricolor that its case is at risk.*

Given the results of the forensic investigation, L'Oréal moved for terminating sanctions against Metricolor in July 2022. 6-ER-751. The district court denied this first motion for sanctions "without prejudice to have a more developed record," 1-ER-40, concluding that the record (as it existed then) did not prove that Metricolor acted with the requisite "bad faith," 6-ER-760. But the district court observed that Metricolor's "conduct and that of its counsel reflect a cascade of concerning missteps implicating several important principles within the Federal Rules of

18

Civil Procedure." 6-ER-760. Indeed, "creating and producing" the altered documents, "even in light of [Metricolor's] proffered explanations, [wa]s completely improper." 6-ER-760. The district court still believed at this juncture, however, that other circumstantial evidence might allow Metricolor to prove trade-secret misappropriation, so the district court let the case continue. 6-ER-761.

The court recognized that "[m]any other people would [have] issue[d] terminating sanctions." 9-ER-1249. And it warned Metricolor: "You are hanging by a thread." 9-ER-1249.

### *A second forensic review reveals that Metricolor deleted and withheld documents after filing suit.*

After its document fabrication came to light in 2021, Metricolor retained its own forensic expert, Kevin Cohen. *See* 3-ER-263-64. In 2023, Cohen released a rebuttal to L'Oréal's report about the Setec Image—the report that had proven that Sal fabricated documents. 1-SER-83-86. But when L'Oréal deposed Cohen about his report, Cohen disclosed for the first time that he had created his own forensic image of Sal's computer years earlier, in October 2021. 3-ER-263-64. That was two months before the Setec Image was created, and after L'Oréal had alleged that Sal fabricated evidence. 3-ER-264. Metricolor had been

19

aware that the Cohen Image existed the entire time. *See* Opening Brief (OB) 54; 9-ER-1293.

After L'Oréal demanded production of the Cohen Image, Metricolor assured the district court that this newly disclosed image was irrelevant. According to Metricolor, it had instructed Cohen "not to rely on" the Cohen Image for any of his opinions, and to focus on the Setec Image instead. 1-SER-15-16. Metricolor urged the court to "pretend [the Cohen Image] never existed, and that—that would be fine with us." 1-SER-16. Metricolor also told the district court that the Cohen Image would "be the exact same" as the Setec Image. 1-SER-68.

This proved false. At L'Oréal's request, the district court ordered Metricolor to give L'Oréal's forensic expert, Paul French, a copy of the Cohen Image. 3-ER-264. French's "initial assessment" showed that the Cohen Image contained thousands of files not found on the later Setec Image. 1-ER-16.

The district court ordered a formal forensic review of the Cohen Image in May 2023, pursuant to the protocol that the parties established for the first forensic review. 1-ER-17. The court explained to Metricolor that "[e]veryone has to know what was there when your

20

expert copied it, and they have to know what was there when their expert copied it because I'm just not gonna let this case go forward without some level of clarity." 1-SER-67. Otherwise, "[i]t's just not fair to a jury." 1-SER-68.

For the forensic review, French used search terms to identify a subset of documents most likely to be relevant, and he gave Metricolor a production log of about 5,600 files in June 2023. 1-ER-17. French also determined that almost half of those documents existed in "unallocated clusters on the Cohen Image, which means they were deleted"—and "most likely deleted during this litigation." 1-ER-28 (quoting 1-SER-21-23). French concluded that Sal's "continued use" of his computer after the creation of the Cohen Image meant that "thousands of documents on the Cohen Image were rendered potentially unrecoverable." 1-ER-16. These findings contradicted Metricolor's representation to the district court in 2021 that Sal's computer was "dead." 1-ER-28 (quoting 1-SER-32-33); *see also* 1-SER-22, 1-SER-26 (French's declaration explaining Sal's ongoing activity on his computer throughout 2021).

French found it "not possible to determine how many files were permanently deleted … before the Cohen Image was taken." *See* 1-ER-

21

28 (quoting 1-SER-23). But French opined "to a reasonable degree of certainty, that more likely than not other files were deleted but overwritten before the Cohen Image was taken, and that those permanently deleted files would include information relevant to the case." 1-ER-28 (quoting 1-SER-23).

### *Metricolor withholds relevant documents recovered during the forensic review, and tries to stop the review.*

Metricolor reviewed the 5,600 documents in tranches and fought to withhold the vast majority of them from L'Oréal and suspend the forensic review. 1-ER-17-18. For instance, Metricolor completed its first round of review in July 2023 and "withh[eld] 1,412 out of 1,413 documents." 1-ER-17. That same month, Metricolor also "filed an *ex parte* application to suspend the forensic review of the Cohen Image." 1-ER-17. And Metricolor's pattern of withholding continued in its later rounds of review. By the time Metricolor finished reviewing all of the documents in August 2023, it was "withh[olding] production" of almost 1,000 documents on claims of attorney-client privilege or work product, and more than 4,500 documents on "various other grounds." 1-ER-17-18. In all, Metricolor withheld about 99% of the documents it reviewed.

The district court rejected this ploy. Setting aside the supposedly

22

privileged documents, it found that Metricolor had "improperly withheld" at least 4,542 documents. 1-ER-18. The district court thus ordered Metricolor to produce "2,500 documents to L'Oréal that are representative of the 4,542 non-privileged documents" by mid-September 2023. 3-ER-277. There, L'Oréal found "more than 175 significant, relevant documents that Metricolor never produced," even though Metricolor's counsel reviewed all of them and had an ongoing obligation to supplement discovery responses under Federal Rule of Civil Procedure 26. 1-ER-18. After additional briefing from both sides, Metricolor released about 2,000 more non-privileged files to L'Oréal in November 2023. 1-ER-18.

All told, L'Oréal found hundreds of relevant documents among the withheld files from the Cohen Image. 1-ER-41. The most salient documents broke down into the following categories:

***Withheld emails where Sal planned to lie to L'Oréal and recounted other lies.*** Sal emailed Stephen in 2015 proposing to give L'Oréal a fake update about field testing of the Metricolor System.[8] The update would be specific, involving "12 hairstylists (10 females and 2

---

[8] BRG-1412.

23

males)" who gave "extremely positive" remarks. 3-SER-569. In Sal's words, however, the test results were "total bullshit and a lie." 3-SER-569. But, he assured Stephen, "there is no way they [c]an prove that we did not do it." 3-SER-569; *see also* 1-ER-29-30.

Other withheld documents detailed Metricolor's ongoing fraud. In an email Sal sent to Stephen in January 2017, for example, Sal reminded Stephen: "I wrote the results of a made up interview with salon owners."[9] 3-SER-571; *see also* 1-ER-30-31. That email shed light on an earlier fabrication. As discussed above, the first forensic review found that, between April 2016 and January 2017, Sal created the results of a survey of salons about hair-color packaging and dispensing, which he later backdated to 2015. *See supra* 15-16. This withheld email now made clear that the survey information was not just backdated, but "made up." 3-SER-571.[10]

---

[9] BRG-3762.

[10] Metricolor suggests that an "audio recording" of the November 2015 meeting confirms that Sal presented these survey results to L'Oréal. OB14-15. But the meeting transcript does not match the made-up survey data. *Compare* 6-ER-895 (transcript claiming survey of 22 salons in which "60%" of stylists used scales to measure products), *with* 2-SER-403-04 (fake survey reflecting that "forty hair salons" said 22% of stylists used scales). And even if it did, that would not change the fact that Sal "made up" the survey data.

24

Metricolor also withheld an email where Sal bragged about lying to L'Oréal about competing offers.[11]  Specifically, Sal boasted of having "repeated several times [to L'Oréal] the mantra" that Metricolor would consider its proposal along with those of "2 competitor companies who also submitted." 3-SER-574.  But no competing offers existed, and Metricolor had pitched only L'Oréal and one other company.  *See* 3-SER-580; 1-ER-31-32; OB34.

***Withheld meeting notes that do not mention Metricolor's supposed trade secrets.***  Metricolor claimed that it disclosed its "first-generation" trade secrets to L'Oréal during meetings in October and December 2014.  *See* 1-ER-32-33.  The withheld documents disproved this.  The Cohen Image revealed a draft of a PowerPoint presentation for an October 2014 meeting with Metricolor's talking points.[12]  1-ER-32.  Those notes made clear that Metricolor presented a product with an "airtight seal," 3-SER-603, a component of the so-called *second-*generation system.

Metricolor's withheld notes for a December 2014 meeting likewise

---

[11] BRG-1473.

[12] BRG-1280.

said nothing about any first-generation system.[13]  To the contrary, they mentioned that Metricolor was working on a "non-leak valve with [a] larger opening."  3-SER-620; *see also* 1-ER-34.  Again, a non-leak valve is airtight, as in the patented "second-generation" system.

***Withheld product-development plans that contradict Metricolor's timeline.***  Another set of withheld emails between Sal and Stephen demonstrated that, far from disclosing the purported first-generation system to L'Oréal in October 2014, Metricolor rejected any such system.[14]  *See* 1-ER-35.  In November 2014, Sal told Stephen that he was researching a cap that "does not have a self sealing part" and "will also be a lot less expensive" than a cap with "self seal."  3-SER-622.  Stephen responded: "No that's not good."  3-SER-622.  In other words, Metricolor first considered using standard, non-airtight orifice reducers *after* the October 2014 meeting—and rejected this idea.

What's more, Metricolor's withheld business plans from April 2012 and November 2014 mentioned only a design with an "airtight seal" and said nothing about non-airtight orifice reducers.[15]  *See* 3-SER-627; 3-

---

[13] BRG-2345.
[14] BRG-4093.
[15] BRG-1831 (2012 plan); BRG-1806 (2014 plan).

SER-636; *see also* 1-ER-36.

Metricolor never explained why it withheld these documents. *See* 1-ER-30-37. It also never produced any authentic document demonstrating the existence of a first-generation system.

### The district court grants terminating sanctions, finding that Metricolor committed grave discovery abuses.

After the latest round of revelations about Metricolor's misconduct, L'Oréal moved again for terminating sanctions. This time, the district court dismissed the case with prejudice. 1-ER-37-44.

The court found that Metricolor—"particularly Sal"—"acted willfully, in bad faith, and with fault by repeatedly fabricating, destroying, and withholding important evidence." 1-ER-40, 1-ER-42. Among other things, Sal had by now admitted that the supposedly contemporaneous field-testing notes Metricolor relied on earlier were not contemporaneous after all; he wrote them in 2018. 1-ER-40. Indeed, Sal testified that he added "buzz words" like "orifice reducer" and "first generation" to documents. 1-SER-56-57. Moreover, the district court concluded that the fabricated portions of the documents involved in the first forensic review were "far too detailed to be reasonably viewed as a mere attempt by Sal to share information with

27

Metricolor's lawyers." 1-ER-40-41.

The forensic review of the Cohen Image also revealed that Metricolor had "attempted to destroy relevant evidence (and was likely successful)." 1-ER-41. And even though Metricolor reviewed "all 5,653 files flagged in the forensic review of the Cohen Image," Metricolor still did not "flag or produce" a single document as responsive to L'Oréal's discovery requests after it examined the files. 1-ER-41. Instead, Metricolor tried to cancel the forensic review. 1-ER-41. But hundreds of those documents were responsive and improperly withheld, because they: (1) "undercut [Metricolor's] claim that it had developed a first-generation system" and "disclosed its alleged trade secret to L'Oréal"; and (2) "reveal[ed] past instances where Sal admitted to fabricating evidence," thus "call[ing] into question the veracity of previously disclosed evidence." 1-ER-41.

The district court next evaluated whether terminating sanctions were appropriate. 1-ER-42-44. First, the district court found that Metricolor's "misconduct has resulted in extensive and prolonged discovery disputes and forensic reviews which will likely continue if this case were to move forward." 1-ER-42. And Metricolor's decision to

28

conceal the Cohen Image for well over a year "contributed significantly to the delay." 1-ER-42.

Next, the district court found that "L'Oréal would suffer significant prejudice" if the case proceeded. 1-ER-42. Although L'Oréal managed to uncover some of Metricolor's wrongdoing, Metricolor likely succeeded in destroying some evidence completely. 1-ER-42-43. Thus, Metricolor "deprived [L'Oréal] of access to important evidence that would otherwise be useful for its defense." 1-ER-43.

The district court then addressed public policy and the availability of lesser sanctions. Although "public policy ordinarily favors disposition of cases on the merits," here, the district court found that Metricolor's misconduct "cast doubt on the veracity and integrity of all evidence in the case." 1-ER-43. "[S]ignificantly," Sal likely succeeded in destroying relevant evidence. 1-ER-43-44.

Thus, the district court found that the "severity and willfulness of [Metricolor's] conduct" meant that "dismissal with prejudice is the only appropriate sanction." 1-ER-44. It was impossible to go to trial on this record, as anything else "would be insufficient to remedy the impact of [Metricolor's] misconduct or to deter future misconduct." 1-ER-44

29

(citation omitted). And the district court saw no point in reserving judgment on sanctions pending a trial because Metricolor had so little evidence to support its trade-secret claims. 1-ER-44. Indeed, "[t]he limited evidence suggesting the existence and conveyance of a trade secret was largely fabricated by Sal." 1-ER-44. Thus, a trial "would be a futile waste of judicial resources," because no reasonable juror who learned about "Sal's campaign of willful fabrication and deception would credit his testimony or evidence." 1-ER-44 (citation omitted).

### *The district court denies reconsideration.*

Metricolor moved for reconsideration after the district court granted terminating sanctions. 1-ER-2. Metricolor argued, among other things, that it "never had the opportunity to present its strong evidence of the brazen trade secret theft that has occurred." 1-ER-5. L'Oréal opposed the motion. 1-ER-5-6. The district court denied it in short order. 1-ER-8-9.

The district court explained that, even crediting Metricolor's "late-raised" evidentiary arguments, the evidence was "not responsive" to the core concerns about "fabricating, destroying, and withholding substantial evidence" that animated the grant of terminating sanctions.

30

1-ER-8. Likewise, a belated declaration from Sal—which Metricolor could have filed earlier but "chose not to"—failed to provide "any plausible alternative explanation for the fabricated documents." 1-ER-9. Sal also offered no explanation for the files missing from the Setec Image or for French's conclusion that Sal likely permanently destroyed relevant evidence. 1-ER-9. In short, Metricolor did nothing to "address the Court's concern that [Metricolor] has 'so damaged the integrity of the discovery process that there can never be assurance of proceeding on the true facts.'" 1-ER-9 (quoting 1-ER-44).

This appeal followed.

## SUMMARY OF THE ARGUMENT

**I.** The district court acted well within its discretion in dismissing this case to sanction Metricolor for fabricating documents that supported its claims, destroying an untold number of relevant documents, and withholding documents that disproved its claims. Metricolor's extreme misconduct justified the district court's conclusion that no lesser sanctions than dismissal would suffice here, because the court could never have confidence in the accuracy or completeness of the record moving forward.

31

**II.** Contrary to Metricolor's view, the district court sanctioned Metricolor for committing egregious discovery abuses by fabricating documents, destroying documents, and withholding documents—not for waiting too long to disclose a forensic image that its expert captured of Sal's computer. But along the way, the district court acted within its discretion by criticizing Metricolor for waiting more than a year to reveal that it possessed evidence that would help to unwind the extent of its own spoliation.

**III.** The district court properly considered Metricolor's entire range of discovery abuses together in imposing terminating sanctions. This Court recognized decades ago that district courts may assess sanctions holistically for the full scope of a litigant's discovery misconduct. Thus, the district court did not need to draw arbitrary lines between instances of misconduct that involved documents produced in different ways.

## STANDARD OF REVIEW

This Court reviews for abuse of discretion the district court's imposition of sanctions, *Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*, 482 F.3d 1091, 1096 (9th Cir. 2007), and the denial of a

32

motion for reconsideration, *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 855 (9th Cir. 2022). The factual findings underlying a sanctions order are entitled to "deference" and "may not be set aside unless they are clearly erroneous." *Anheuser-Busch*, 69 F.3d at 348, 354. This Court will not "disturb the district court's choice of sanction" absent a "definite and firm conviction that the district court committed a clear error of judgment." *Leon v. IDX Sys. Corp.*, 464 F.3d 951, 961 (9th Cir. 2006) (citation omitted).

## ARGUMENT

Dismissal as a sanction is "warranted" when "a party has engaged deliberately in deceptive practices that undermine the integrity of judicial proceedings." *See Anheuser-Busch*, 69 F.3d at 348 (collecting cases). Here, Metricolor tampered with the documentary record in almost every way possible, including fabricating key documents connected to its first-generation trade-secret theory, withholding evidence that contradicted this new theory, and destroying relevant evidence. The district court properly exercised its discretion in holding that the case could not continue in the face of Metricolor's rampant discovery abuses.

33

I.  **The District Court Acted Well Within Its Discretion In Awarding Terminating Sanctions For Metricolor's Severe Misconduct.**

This Court has repeatedly affirmed terminating sanctions when a party's intentional, bad-faith discovery conduct so taints the record that the opposing party cannot fairly litigate the case. *See Anheuser-Busch*, 69 F.3d at 348 (affirming terminating sanctions where the plaintiff "willfully and in bad faith violated the rules of discovery by withholding [relevant] documents from [the defendant] and had repeatedly violated" the district court's pretrial publicity order); *Conn. Gen.*, 482 F.3d at 1097 (affirming grant of default judgment where the defendant's "pattern of deception and discovery abuse made it impossible for the district court to conduct another trial with any reasonable assurance that the truth would be available" (citation omitted)); *Jones v. Riot Hosp. Grp. LLC*, 95 F.4th 730, 735 (9th Cir. 2024) (affirming terminating sanctions where the plaintiff intentionally and permanently deleted text messages).

The district court did not abuse its discretion in finding those circumstances present here. To the contrary, the court carefully analyzed extensive documentation of Metricolor's spoliation—much of it

34

uncontested—and correctly found that: (1) Metricolor's fabrication, withholding, and deletion of evidence was the product of "willfulness, bad faith, and fault"; (2) the public interest and the court's need to manage its docket favored dismissal; (3) "L'Oréal would suffer significant prejudice if this case were to proceed"; (4) public policy favored dismissal given the severity of Metricolor's discovery misconduct; and (5) "less drastic sanctions" were not available given "the severity and willfulness of plaintiff's conduct." 1-ER-37-44; *see Anheuser-Busch*, 69 F.3d at 348.

Except for (1) arguing that the district court should have imposed lesser sanctions and (2) summarily asserting that it did not act in bad faith, OB58-67, Metricolor ignores most of the district court's findings. And Metricolor never argues that any finding was clearly erroneous. As a result, Metricolor forfeited any challenge to the district court's fact-finding and to most of the district court's analysis by failing to raise those issues "specifically and distinctly in [its] opening brief." *Greenwood v. FAA*, 28 F.3d 971, 977 (9th Cir. 1994). L'Oréal nevertheless addresses each of the district court's findings to illustrate how the court appropriately exercised its discretion.

35

### A.    The district court's findings supported an award of terminating sanctions.

**1.**  The district court correctly found that Metricolor "acted willfully, in bad faith, and with fault by repeatedly fabricating, destroying, and withholding important evidence."  1-ER-37-42; *see Leon*, 464 F.3d at 958; *Jones*, 95 F.4th at 735.  And the district court made these findings for good reason:  Sal fabricated "highly-specific" documents to support Metricolor's claims, such as "cost estimates" for the first-generation system and an email backdated to look like he had sent it four years earlier.  1-ER-41; *supra* 13-17.  He then lied to the district court, insisting that the fake documents were "a mere attempt … to share information with Metricolor's lawyers."  1-ER-40-41; *see* 1-ER-22 n.3 (discussing inconsistencies between Sal's statements about the fabricated documents and his lawyers' statements).

Sal also deleted evidence revealing, among other things, that he had "made up" survey results that Metricolor produced to L'Oréal.  *See* 1-SER-23-25.  And after the forensic reviews uncovered Sal's misconduct, Metricolor wrongly withheld relevant documents from L'Oréal for months without any justification.  1-ER-41.  As the district court noted, Metricolor never even tried to explain "why it was not

36

obligated to disclose such documents upon their discovery." 1-ER-41.

Metricolor does not "specifically and distinctly" challenge the district court's finding of bad faith. *Greenwood*, 28 F.3d at 977. For example, Metricolor does not dispute that Sal fabricated documents during this litigation. It just parrots Sal's lie that he constructed these elaborate fabrications solely "to recreate [documents] for his attorneys." OB24. But the district court rejected Sal's subterfuge, and its factual findings receive deference and "may not be set aside unless they are clearly erroneous." *Anheuser-Busch*, 69 F.3d at 348, 354. They are not; the level of detail in the fabricated documents and Sal's extensive efforts—involving scissors, tape, and a copier—to make the fabricated email look authentic, *see supra* 13-14, validate the district court's conclusion that Sal intended to pass the fabrications off as genuine to improve Metricolor's chances in this case.

Metricolor also does not dispute that it withheld relevant documents after reviewing the files on the Cohen Image. Nor, even now, does it offer any explanation to justify that withholding; it just makes the bare assertion that "[t]here was no willful withholding." OB58; *see also* OB62 (similar). Likewise, Metricolor does not dispute

37

that Sal deleted evidence.  Instead, it claims without explanation that Sal did not do so "willfully or intentionally."  OB58 n.16.  These conclusory assertions do not demonstrate clear error in the district court's findings.

At most, Metricolor offers a few nonsensical justifications for its misconduct.  For example, Metricolor insists that Sal's "total bullshit and a lie" email "did not indicate dishonesty because the testing in question was *never sent* [to] L'Oréal."  OB33.  But as the district court found, Sal's plan to lie to L'Oréal bore on his "credibility and the veracity of certain documents in this action."  1-ER-29.  To name just one such document, Sal faked a "made up" survey of salon owners, and Metricolor produced that fabricated survey to L'Oréal.  *Supra* 24.

Metricolor also asserts that Sal's lies to L'Oréal about having competing proposals for the Metricolor System "did not show lying under oath," OB26, as if nothing less than perjury could indicate bad faith.  That is not the law.  That said, Sal did lie under oath repeatedly, such as when he testified that he wrote an email in 2016 that he had actually fabricated and backdated in 2020, s*upra* 11, and when he falsely insisted that he stopped using his computer after 2020 because it

38

"was dead" and "gone," 1-SER-78-81; *see* 1-ER-28.[16]

Metricolor closes by espousing generalizations about discovery. According to Metricolor, courts should not "infer nefarious intent or bad faith from ordinary discovery errors." OB64 (quoting *PaineWebber Grp. v. Zinsmeyer Trs. P'shp*, 187 F.3d 988, 993 (8th Cir. 1999)). And Metricolor cites a series of district-court cases for the proposition that "perfection," "miracle workings," and "flawless litigation" are not required. *See* OB50-51 (internal quotation marks omitted). But the abuses here far surpassed "ordinary discovery errors" or slight flaws. Indeed, the district court noted that it had granted only one other motion for terminating sanctions in more than 25 years on the bench. 9-ER-1273-74. And Metricolor has not come close to showing that the court clearly erred in finding bad faith, willfulness, and fault.

**2.** Next, the district court correctly found that "the public's interest in expeditious resolution of cases and docket management

---

[16] Citing only attorney argument, Metricolor claims that Sal "truthfully represented his computer had died." OB64 (citing 9-ER-1282). Metricolor ignores the district court's finding that Sal "'deliberately altered the computer' during that time period." 1-ER-28 (quoting 1-SER-26); *see also* 1-SER-22 (French's declaration proving that Sal used his computer throughout 2021).

favor[ed] dismissal." 1-ER-42. Metricolor's various discovery abuses led to "extensive and prolonged discovery disputes and forensic reviews" that would "likely continue" if this case "move[d] forward." 1-ER-42. The abuses included "conceal[ing] the existence of the Cohen Image" for more than a year, 1-ER-41-42, which hid Sal's destruction of evidence and the existence of other relevant, as-yet-unproduced evidence.

Metricolor's misconduct forced L'Oréal to litigate this case with only part of the story at hand. As L'Oréal explained to the district court, if this case had continued after Metricolor eventually relinquished the withheld documents, L'Oréal would have needed to pursue "yet another round of depositions relating to the newly discovered evidence, additional discovery, and likely more motions practice" that would "consume substantial additional resources." 3-SER-562. After years of litigating over Metricolor's wrongdoing, repeating the cycle would have been a poor use of judicial and party resources. *See Conn. Gen.*, 482 F.3d at 1095 (affirming terminating sanctions where the defendants dedicated years to "evasion and noncompliance" with the district court's "order compelling discovery"). Moreover, Metricolor's "last-minute tender of [the withheld] documents

40

does not … restore to other litigants on a crowded docket the opportunity to use the courts." *Anheuser-Busch*, 69 F.3d at 354.

Metricolor does not make any arguments about public-interest or docket-management here. Although Metricolor asserts that it did not need to disclose the Cohen Image at all, it does not deny that it delayed this litigation by fabricating, destroying, and withholding documents. Metricolor has thus forfeited any argument about these findings. *Greenwood*, 28 F.3d at 977.

**3.** The district court correctly found that Metricolor's misconduct—especially fabricating and destroying evidence—caused "significant prejudice" to L'Oréal. 1-ER-42. In this context, prejudice arises where the spoliating party's actions "threatened to interfere with the rightful decision of the case." *Leon*, 464 F.3d at 959. As an initial matter, fabricating evidence alone met that threshold by risking having a jury decide the case in Metricolor's favor based on Sal's lies.

Destroying evidence likewise prejudiced L'Oréal by "depriv[ing] [L'Oréal] of access to important evidence that would otherwise be useful for its defense." 1-ER-43. To be sure, "it is impossible to identify" which destroyed files were relevant and "how they might have been

41

used." *Leon*, 464 F.3d at 960. But that is precisely the problem, as the district court recognized. 1-ER-42-43. Deleting evidence "threaten[s] to distort the resolution of the case, because any number of the [deleted] files could have been relevant to [L'Oréal's] claims or defenses." *Leon*, 464 F.3d at 960 (citation omitted); *see also Jones*, 95 F.4th at 735 (dismissal proper following intentional deletion of documents where destroyed evidence "cannot be restored or replaced through additional discovery"). To the extent Metricolor addresses prejudice, its challenge is intertwined with the analysis of lesser sanctions, and L'Oréal therefore addresses it below.

**4.** The district court also correctly found that public policy favored dismissing the case, given the "severity and willfulness of [Metricolor's] conduct." 1-ER-43-44. Indeed, given the scope of Metricolor's wrongdoing, any lesser sanction than dismissal would be an open invitation to abuse the judicial system. While the district court acknowledged that public policy "ordinarily favors" deciding cases on the merits, it recognized that "the most critical factor" for case-dispositive sanctions is "whether a party's discovery violations make it impossible for a court to be confident that the parties will ever have

42

access to the true facts." 1-ER-43 (quoting *Conn. Gen.*, 482 F.3d at 1097). Put differently, public policy "lends little support to a party whose responsibility it is to move a case toward disposition on the merits but whose conduct impedes progress in that direction," as Metricolor's misconduct did here. *In re Phenylpropanolamine (PPA) Prods. Liab. Litig.*, 460 F.3d 1217, 1228 (9th Cir. 2006). Given Metricolor's repeated actions in fabricating "significant documents," withholding critical evidence, and destroying relevant evidence, the district court rightly lacked confidence in the accuracy or completeness of the record. 1-ER-43-44.

## B. The district court correctly rejected lesser sanctions.

As to the one finding Metricolor squarely addresses in its brief, the district court did not abuse its discretion in concluding that no lesser sanction would "remedy the impact of [Metricolor's] misconduct" or "deter future misconduct." 1-ER-44 (citation omitted). This is not a close call, given the scope of Metricolor's misconduct.

### 1. The district court properly considered and rejected lesser sanctions.

District courts may award terminating sanctions only if lesser sanctions would not suffice to redress the misconduct. *See Leon*, 464

F.3d at 960; *Jones*, 95 F.4th at 736. In assessing "whether the district court properly considered lesser sanctions," this Court "examine[s]": (1) "whether the district court implemented alternative sanctions before ordering dismissal"; (2) "whether the district court warned the party of the possibility of dismissal before ordering dismissal"; and (3) "whether the district court explicitly discussed the feasibility of less drastic sanctions and explained why such alternate sanctions would be inappropriate." *Leon*, 464 F.3d at 960 (quoting *Anheuser-Busch*, 69 F.2d at 352). The district court satisfied each factor here.

*First*, the district court implemented alternative sanctions before dismissal. When it denied L'Oréal's first motion for sanctions, the district court ruled that Metricolor could not "use the four [fabricated] documents … in its case-in-chief." 6-ER-761. But the court held that L'Oréal could use those documents "to impeach the credibility of [Metricolor's] witnesses at trial and to support the inference that the original version[s]" were "less helpful" to Metricolor. 6-ER-761-62. Then, by the time of L'Oréal's second motion for sanctions, this factor became "inapplicable" because Metricolor destroyed evidence "before the district court had an opportunity to compel discovery" of that evidence

44

"or otherwise order 'lesser sanctions.'" *Leon*, 464 F.3d at 960.

*Second*, the district court plainly warned Metricolor "of the possibility of dismissal." *Id.* Even though "an explicit warning is not always necessary" before imposing terminating sanctions, *Adriana Int'l Corp. v. Thoeren*, 913 F.2d 1406, 1413 (9th Cir. 1990), the district court told Metricolor after the fabricated documents came to light that further misconduct could end its case, which was "hanging by a thread," 9-ER-1249. Metricolor did not heed that warning.

*Third*, the district court considered "less drastic sanctions and explained why such alternate sanctions would be inappropriate." *Leon*, 464 F.3d at 960. The "most critical factor" for assessing case-dispositive sanctions is whether "a party's discovery violations make it impossible for a court to be confident that the parties will ever have access to the true facts." *Conn. Gen.*, 482 F.3d at 1097 (citation omitted). The district court gave due weight to that decisive factor here and found that Metricolor's misconduct crossed the threshold for termination. 1-ER-43-44. It explained that by fabricating, destroying, and withholding evidence, Metricolor "so damage[d] the integrity of the discovery process that there can never be assurance of proceeding on the true facts." 1-

45

ER-44 (quoting *Conn. Gen.*, 482 F.3d at 1097).

These findings were not clearly erroneous. Among other things, neither L'Oréal nor the district court could ever know what evidence Sal succeeded in eliminating from his computer. See 9-ER-1290. As French detailed, the forensic review of the Cohen Image recovered deleted files "sitting in unallocated clusters," meaning files that Sal's computer had not yet "overwritten with new data." 1-SER-22-23. But it is simply not possible to recover files that have been "supplanted by new data" and thus permanently deleted. 1-SER-22-23. Given "the aggressive pace" at which Sal's brand of computer "rapidly overwrite[s] data in unallocated clusters," however, French concluded "to a reasonable degree of certainty" that Sal succeeded in "permanently delet[ing] files [that] would include information relevant to the case." 1-SER-22-23. Thus, the district court correctly found that it "[could not] in good conscience have a jury try a case on a record that … is either false or incomplete." 9-ER-1290; see 1-ER-9.

## 2. Metricolor's arguments ignore the seriousness of its discovery violations.

According to Metricolor, the district court should have allowed Metricolor to "rely simply on L'Oréal's own documentation and

46

testimony" at trial, while excluding Metricolor's evidence. OB63. In other words, the district court should have "sanctioned" Metricolor by merely excluding the "questionable documents" that Metricolor says it "did not need" to "further its case." OB63; *see also* OB58 (similar).[17] Metricolor forfeited this argument by raising it for the first time only after the district court granted terminating sanctions, in its motion for reconsideration. *See* 11-ER-1397.

In any event, this argument is meritless. To start, Metricolor's argument rests on the false premise that "any relevant evidence" deleted from Sal's computer "was as likely to have helped Metricolor as it was to aid L'Oréal." OB57 (relying on *Medina v. Boeing Co.*, No. 20-cv-00304, 2022 WL 599021, at *4 (C.D. Cal. Jan. 27, 2022)). But Sal had no motivation to delete documents that supported his own case. And the deleted and withheld documents here undercut Metricolor's

---

[17] Metricolor also contends that the case should go forward to trial because L'Oréal "has a track record of massive trade secret theft against startups." OB60. To support this accusation, Metricolor musters only a single news article from 2019 about a verdict against L'Oréal in an unrelated case. OB60 n.18. And Metricolor neglects to mention that the Federal Circuit reversed that verdict on appeal because "no reasonable jury could have found either trade-secret misappropriation or breach of contract." *Olaplex, Inc. v. L'Oréal USA, Inc.*, 855 F. App'x 701, 705 (Fed. Cir. 2021).

trade-secret claims, *supra* 23-27, making this case nothing like *Medina*, where the district court found that the deleted documentation likely would have helped the spoliating party, *see* 2022 WL 599021, at *4.

Indeed, Metricolor has never identified a single document helpful to its case that surfaced during its review of deleted and withheld evidence. Moreover, "where documents relevant to the merits of the litigation have been concealed[,] the deception casts doubt on the concealing party's case," not the victim's. *Anheuser-Busch*, 69 F.3d at 354; *see Jones*, 95 F.4th at 736 (explaining that the intentional destruction of evidence "can support not only an inference that the lost information was unfavorable to the party that intentionally destroyed it, but also an inference that the opposing party was prejudiced by the loss of information").

Metricolor tries to save its case by arguing that Sal's spoliation was not that bad. The implication seems to be that lesser sanctions would have sufficed because Sal's actions did not completely undermine the record. *See* OB56-57 (asserting that Metricolor's conduct did not prevent "a just result" because Metricolor eventually disclosed "responsive emails" after reviewing the Cohen Image); OB65 (protesting

48

that sanctions should not have turned on the "relatively slim number of documents" that Metricolor fabricated and withheld).

None of these assertions stand up under scrutiny. There is not a "slim" number of documents at issue. Metricolor's spoliation included at least five fabricated documents,[18] at least 280 responsive and withheld documents (some of which Sal had tried to delete), and an untold number of permanently destroyed documents. *Supra* 21-27. More to the point, there is no magic number of discovery-abuse freebies that litigants can commit before sanctions set in. And the mere fact that Metricolor eventually turned over some responsive documents from Sal's computer—after being ordered to do so—does not mean that the district court clearly erred in finding that Metricolor "so damage[d] the integrity of the discovery process that there can never be assurance of proceeding on the true facts." 1-ER-44 (quoting *Conn. Gen.*, 482 F.3d at 1097). On the contrary, "production of some evidence does not excuse destruction of other relevant evidence." *Jones*, 95 F.4th at 736.

Tellingly, in support of its lesser-sanctions argument, Metricolor cites cases—mostly district-court cases—where the spoliation occurred

---

[18] The fifth is Sal's handwritten notes, discussed above. *Supra* 17.

on a much smaller scale, caused far less prejudice to the non-spoliating party, and could be fairly addressed without terminating sanctions. *See, e.g.*, *Halaco Eng'g Co. v. Costle,* 843 F.2d 376, 381 (9th Cir. 1988) (disputed report went to a "peripheral matter"); *In re Napster, Inc. Copyright Litig.*, 462 F. Supp. 2d 1060, 1077 (N.D. Cal. 2006) ("Although Hummer is at fault for deleting emails, plaintiffs have not shown that Hummer acted willfully in destroying its emails, and there is evidence that the actual number of emails lost is small."); *Raygoza v. City of Fresno*, 297 F.R.D. 603, 607 (E.D. Cal. 2014) ("The prejudice to Defendants from Plaintiffs' dilatory conduct can be remedied by allowing Defendants (only) additional time to complete discovery at no extra expense."). The sweeping discovery abuses in this case counsel in favor of a different outcome.

Metricolor also seeks to narrow the scope of its spoliation by asserting that some of the withheld documents "would have been subject to exclusion" as "irrelevan[t]" or "more prejudicial than probative." OB61. Which ones? Sal's admission that he was contemplating sending L'Oréal "total bullshit and a lie"? *Supra* 23. Metricolor's withheld notes undermining its claim that it shared its

50

purported first-generation trade secret with L'Oréal? *Supra* 25-26.
Metricolor does not even try to specify which documents it thinks would
have been excluded at trial, let alone why.[19]  Further, as discussed
above, Metricolor has never provided any justification for withholding
these and other obviously relevant documents from L'Oréal.  The
district court did not abuse its discretion in finding that the broad scope
of Metricolor's spoliation justifies terminating sanctions.

> ### 3. The supposed merits of Metricolor's case have no bearing on the sanctions analysis.

Metricolor insists that it can win this case with L'Oréal's
documents alone, and it contends that the district court erred by failing
to consider the probative value of L'Oréal's evidence.  *See* OB62.  This
argument misunderstands both the law and the district court's decision.

First, on the law, "court[s] should not closely scrutinize the merits
of an action" when considering dismissal as a sanction.  *Anderson v. Air
West, Inc.*, 542 F.2d 522, 526 (9th Cir. 1976); *see also* 1-ER-8, 1-ER-37
(district court citing *Anderson*).  Thus, "[e]ven if the plaintiff has an

---

[19] The one exception is Metricolor's conclusory assertion that BRG-997
and BRG-3879 were "irrelevant" and "immaterial."  OB27.  But the
district court did not even mention those documents in its sanctions
order, making them irrelevant to this appeal.

obviously strong case, dismissal would be appropriate if the plaintiff has clearly ignored his responsibilities to the court in prosecuting the action and the defendant ha[s] suffered prejudice as a result." *Anderson*, 542 F.2d at 526. Put differently, "'the public policy favoring disposition of cases on their merits,' … standing alone," cannot "outweigh" findings that a party derailed the case through its bad-faith discovery abuses. *Leon*, 464 F.3d at 960-61 (quoting *Malone v. USPS*, 833 F.2d 128, 133 n.2 (9th Cir. 1987)).

In any event, Metricolor is wrong on the facts. The district court evaluated Metricolor's case and found that it was not meritorious. *See* 1-ER-44. Specifically, the court found that Sal fabricated the "limited evidence suggesting" that Metricolor ever had first-generation trade secrets or disclosed them to L'Oréal. 1-ER-44. By contrast, "contemporaneous meeting notes and business plans make no mention of the alleged trade secret[s]." 1-ER-44; *see supra* 25-26. Indeed, Metricolor does not identify a single authentic document that mentions a first-generation system.

As for L'Oréal's evidence that Metricolor now emphasizes—all of which is "circumstantial" at best, OB65-67—Metricolor failed to bring

52

any of it to the district court's attention until after the court had already granted terminating sanctions. 1-ER-8. Metricolor did this even though "all of the evidence" that it presented in seeking reconsideration "was previously known to [Metricolor] and could have been presented during the initial briefing on [L'Oréal's] motion for terminating sanctions." 1-ER-8 n.2. In short, that late-breaking evidence could not justify reconsideration under the district court's local rules. 1-ER-8 n.2.

And Metricolor has no explanation for its failure to raise the evidence earlier, other than bemoaning that "it lacked an opportunity to advance its own position" while "fending off L'Oréal's allegations of wrongdoing."[20] OB41-42. But Metricolor's regret about its strategic choice not to raise this evidence earlier (or not to request additional pages for its sanctions opposition) does not excuse the forfeiture. *See O'Guinn v. Lovelock*, 502 F.3d 1056, 1063 n.3 (9th Cir. 2007).

Ultimately, Metricolor cannot escape Sal's many demonstrations

---

[20] Metricolor filed an overlength opposition to L'Oréal's second motion for sanctions. *See* 1-SER-8. It spent five pages arguing that it had a "strong and meritorious" trade-secret case, but that brief still failed to raise the evidence on which Metricolor now relies. 2-ER-125-29.

of his willingness to "say" and do "anything at any time in order to prevail in this litigation." *Anheuser-Busch*, 69 F.3d at 352 (citation omitted). This misconduct forced the district court to conclude that all of Metricolor's evidence might have been fabricated and any trial "would be a futile waste of judicial resources." 1-ER-44 (citation omitted). Because "[t]here is no point to a lawsuit if it merely applies law to lies," the district court "fairly exercised its discretion" in dismissing the case to sanction Metricolor and in denying reconsideration. *Conn. Gen.*, 482 F.3d at 1097 (citation omitted). Metricolor cannot show that "the district court committed a clear error of judgment" in dismissing the case, and this Court should not "disturb the district court's choice of sanction." *Leon*, 464 F.3d at 961.

## II. The District Court Sanctioned Metricolor For Fabricating, Destroying, And Withholding Evidence, Not For Failing To Disclose The Cohen Image.

Metricolor argues that the district court abused its discretion by sanctioning Metricolor for not disclosing the Cohen Image before the deadline for expert reports. OB51-58. Metricolor misunderstands the district court's order. As discussed at length above, the district court sanctioned Metricolor for fabricating documents that appeared to

54

substantiate its case, while deleting and withholding documents that disproved it. *See supra* 36-43. The court simply noted Metricolor's failure to reveal the existence of the Cohen Image after describing a host of actions contributing to Metricolor's bad faith and delay. In any event, the district court was right to criticize Metricolor for concealing for years the best evidence of its spoliation.

Metricolor also implies that the district court applied the wrong legal analysis to its destruction of evidence. Metricolor suggests that the court should have cited Federal Rule of Civil Procedure 37(e), which governs the loss of electronically stored information. OB54-56. But the district court made every finding required to dismiss under Rule 37(e)—something Metricolor does not even dispute. This Court has affirmed dismissal in similar circumstances, and it should do so here.

## A.    The district court did not abuse its discretion by discussing the Cohen Image.

Metricolor's argument that the district court invented improper requirements for expert disclosures depends on the false premise that the district court "issued terminating sanctions largely for alleged concealing of the Cohen Image." OB52. But the Cohen Image was simply a focus because it helped to explain how Metricolor's spoliation

came to light.

To start, the Cohen Image provided evidence of the document deletions. *See* 1-ER-41 ("The forensic review of the Cohen Image … indicates that [Metricolor] attempted to destroy relevant evidence (and was likely successful)."). Specifically, after Metricolor's expert captured the Cohen Image, but before L'Oréal's expert could gain access to Sal's computer, thousands of files were deleted from the computer. 1-SER-26. As discussed above, Metricolor never denies that Sal deleted documents. Thus, it is impossible to understand how describing *the way* those deletions were discovered—through the Cohen Image—could possibly demonstrate an abuse of discretion.

The district court also discussed the Cohen Image to explain Metricolor's improper withholding of relevant documents. It found that "[a]fter reviewing all 5,653 files flagged in the forensic review of the Cohen Image, [Metricolor] did not flag or produce any documents as responsive to defendants' discovery requests." 1-ER-41. But L'Oréal's review of a subset of those files "revealed at least 280 relevant and responsive documents, including documents that" "undercut" Metricolor's claims, "reveal[ed] past instances where Sal admitted to

56

fabricating evidence," and "call[ed] into question the veracity of previously disclosed evidence."  1-ER-141.  Here again, the relevant fact was not the timing of the Cohen Image's disclosure.  The issue is that *even after* reviewing every document uncovered through the Cohen Image, Metricolor inexplicably continued to withhold the relevant ones. Metricolor has never explained that withholding, including in its opening brief.  And whether Metricolor timely disclosed the Cohen Image has no bearing on whether Metricolor later withheld relevant documents during a spoliation investigation.

To be sure, the timing was peripherally relevant to some of the district court's sanctions analysis.  In discussing Metricolor's bad faith, the district court observed that Metricolor "concealed the existence of the Cohen Image for nearly a year-and-a-half after its creation."  1-ER-141.  The court explained that without "the eventual discovery of the Cohen Image, [L'Oréal] may never have discovered [Metricolor's] attempted deletion of evidence."  1-ER-41.  The point was simply that Metricolor's choice not to admit what it had done—in any capacity— indicated bad faith.  Further, as discussed above, the court made extensive findings of "willfulness, bad faith, and fault" that rested on

57

Metricolor's flagrant spoliation of documents—not the timing of the
Cohen Image's disclosure. *Supra* 36-39. That Metricolor, which knew
about its own spoliation, did not come clean at any point—whether by
disclosing the Cohen Image or through any other means—simply
provides further support for that ruling.

The district court also briefly mentioned the timing of the Cohen
Image's disclosure in discussing the delay factor. The court found that
Metricolor's "misconduct has resulted in extensive and prolonged
discovery disputes and forensic reviews which will likely continue if this
case were to move forward," and it noted that Metricolor's "decision to
conceal the existence of the Cohen Image for nearly a year-and-a-half
has contributed significantly to the delay." 1-ER-42. That was true,
and Metricolor does not even dispute that, had it produced the Cohen
Image earlier, it could have reduced the delay caused by Sal's actions.

Metricolor repeatedly asserts that it had no reason to turn over
the Cohen Image (or the underlying documents) because Metricolor's
attorneys did not know that the image would reveal anything different
from the Setec Image. *E.g.*, OB49, 51, 54. Metricolor also protests that
"Cohen never conveyed the Cohen Image to Attorney Martorell, or

58

anyone at his firm." OB51. But Metricolor admits that its "counsel [was] aware Cohen was imaging Sal's computer." OB54; *see* 9-ER-1293 ("We knew he had it."). And Sal obviously knew about the relevant and unproduced documents on his computer, because he was busy trying to destroy them. Metricolor cannot hide behind its principal's apparent choice to conceal that spoliation from his attorneys.

Metricolor also argues that, under the normal expert discovery rules, it did not need to produce the Cohen Image any earlier than it did. OB52. This misses the point, because there is nothing normal about this case. After Metricolor deleted relevant documents, it could have, at minimum, tried to right things by disclosing the best evidence of what it had deleted. After all, Rule 26(e) obligates parties to "supplement or correct" their discovery disclosures and production on an ongoing basis. Here, turning over the Cohen Image was the only way to produce the relevant documents that Sal tried to delete from his computer. Or, short of that, Metricolor could have simply explained what had happened and saved years of litigation about whether it deleted or withheld documents. Rather than doing any of that, however, Metricolor fought tooth and nail—over years and during the

59

course of a forensic review—to give the false impression that it did nothing wrong. *See supra* 17-23. The district court did not clearly err in making the common-sense observation that this conduct wasted time.

Finally, Metricolor goes so far as to suggest that the documents underlying the Cohen Image were themselves Cohen's "work product" until Cohen's deposition. OB58. That is wrong. Cohen did not "prepare[]" those documents, such as Sal's emails about lying to L'Oréal, "in preparation for litigation." *United States v. Richey*, 632 F.3d 559, 567 (9th Cir. 2011). Cohen just took a snapshot in time of Sal's computer. The mere fact that discoverable, relevant documents appeared on the forensic image did not transform them into Cohen's work product. *See id.*; *cf. Advanced Display Sys. v. Kent State Univ.*, 212 F.3d 1272, 1289 (Fed. Cir. 2000) ("This court, however, is unable to find any legal principle that even remotely supports the notion that an otherwise discoverable document alchemically metamorphosizes into privileged work product simply because an attorney photocopies it.").

In sum, the district court properly sanctioned Metricolor for fabricating, deleting, and withholding documents—not because Metricolor waited too long to turn over an expert's file that evidenced

this spoliation.  But the district court had every right to criticize Metricolor for not revealing the Cohen Image sooner, just as the court would have criticized any litigant that spent more than a year hiding that it destroyed and withheld evidence.  Indeed, Metricolor now admits that not turning over the Cohen Image earlier was "[p]erhaps" a "blunder."  OB62.  That puts it mildly.

### B. The district court made the findings necessary to sanction Metricolor for destroying evidence under Rule 37(e).

Metricolor asserts that the district court needed to apply Rule 37(e) to the terminating sanctions analysis—but only with respect to the Cohen Image and Metricolor's destruction of electronically stored information.  *See* OB54-56.  Specifically, Metricolor argues that the district court could not rely on its inherent authority to address this one facet of Metricolor's misconduct and "would have had to instead make a ruling" under Rule 37(e).  OB54-55.  This argument fails both because Metricolor forfeited it, and because the district court made all of the necessary findings.  Indeed, less than a year ago, this Court affirmed terminating sanctions in near-identical circumstances.

*First*, Metricolor forfeited the argument by not raising it below.

61

*See O'Guinn*, 502 F.3d at 1063 n.3. The district court analyzed the five factors described in *Anheuser-Busch* (along with assessing bad faith) both in its initial order denying L'Oréal's motion for sanctions, 6-ER-758, and in its later order dismissing the case, 1-ER-19. L'Oréal framed its requests for sanctions around those same factors. *E.g.*, 3-SER-556-64. Metricolor never argued that the *Anheuser-Busch* factors were irrelevant to its destruction of evidence or that the district court had to make a different set of findings before sanctioning Metricolor for that particular misconduct. *See* 2-ER-46-63 (Metricolor's reply supporting reconsideration); 2-ER-120-49 (Metricolor's opposition to L'Oréal's second motion for sanctions); 11-ER-1394-1414 (Metricolor's motion for reconsideration). Now is too late for Metricolor to make that argument for the first time.

*Second*, although the district court did not cite Rule 37(e) expressly, it made all the findings necessary for dismissal under that rule—something Metricolor does not contest. Rule 37(e) authorizes certain sanctions (including dismissal) where "electronically stored information [ESI] that should have been preserved … is lost because a party failed to take reasonable steps to preserve it, and it cannot be

62

restored or replaced through additional discovery." If the spoliating party "acted with the intent to deprive another party of the information's use in the litigation," the district court may "dismiss the action." Fed. R. Civ. P. 37(e)(2). The test for dismissing under Rule 37(e) is less stringent than the *Anheuser-Busch* factors, because "a district court need only find that the Rule 37(e) prerequisites are met, the spoliating party acted with the intent required under Rule 37(e)(2), and lesser sanctions are insufficient to address the loss of the ESI." *Jones*, 95 F.4th at 735.

This Court recently made clear that a district court can satisfy Rule 37(e)(2)'s requirements by evaluating the *Anheuser-Busch* factors and making the appropriate findings. *See id.* at 735-36. In *Jones*, the district court found Rule 37(e)'s prerequisites satisfied where the plaintiff intentionally destroyed text messages that should have been preserved, and could not be restored. *See id.* at 735. And, applying the *Anheuser-Busch* factors, the district court reasoned that lesser sanctions could not remedy the plaintiff's intentional misconduct. *Id.* This Court affirmed terminating sanctions. *Id.*

The district court here also made the requisite Rule 37(e) factual

63

findings and appropriately applied the *Anheuser-Busch* factors. *See supra* 36-46. First, it found that information that should have been preserved was "lost": Sal deleted relevant files on his computer during the course of litigation, destroying some files permanently. 1-ER-41, 44. Second, additional discovery could not replace the destroyed files because it would be impossible to determine exactly what Sal destroyed. 1-ER-42-44. As French explained, no technology could recover files that Sal's computer permanently deleted. *See* 1-ER-42-43 (citing 1-SER-23). Third, Sal "acted willfully, in bad faith, and with fault" by destroying the ESI—in other words, he intended to prevent L'Oréal from learning the truth and using the destroyed evidence to defeat Metricolor's claims. *See* 1-ER-39-42. And fourth, as discussed in depth above, the district court found that lesser sanctions could not remedy Sal's campaign of willful destruction. *Supra* 43-54. The district court therefore made all the findings necessary to dismiss the case under Rule 37(e). For the reasons discussed above, none of these findings were clearly erroneous.

*Third*, any error in not expressly relying on Rule 37(e) was also harmless because Metricolor's misconduct extended beyond permanently destroying evidence. Among other things, Sal fabricated

64

crucial documents that bolstered Metricolor's trade-secret claims, and Metricolor withheld documents that undermined those claims. *Supra* 19-27. Indeed, the fabrications alone justify terminating sanctions: Sal, "whether or not in collusion with counsel, … attempted to deceive the district court on material matters before it. Falsifying evidence is grounds for the imposition of the sanction of dismissal." *Combs v. Rockwell Int'l Corp.*, 927 F.2d 486, 488 (9th Cir. 1991). Because this Court could affirm on that basis, any error in not applying Rule 37(e) made no difference. And appellate review does not turn on issues that "do not affect the substantial rights of the parties." 28 U.S.C. § 2111.

### III. The District Court Had No Obligation To Silo Metricolor's Related Misdeeds From Each Other.

Finally, Metricolor argues that the district court abused its discretion by imposing "cumulative" sanctions for "different wrongs" related to what Metricolor calls "the Physically-Produced Documents and the ESI documents." OB48-50. This argument is forfeited, and it misrepresents the law.

For context, Metricolor uses the terms "Physically-Produced Documents" and "PPD" to refer to the documents that Sal fabricated. *See* OB9. Metricolor produced those fake documents electronically

65

within a single PDF. *See* 1-SER-245. Metricolor distinguishes the fabricated documents in the PDF from the electronically stored information on Sal's computer that he deleted (and which Metricolor later withheld). *See* OB9, 48. Metricolor asserts that the district court should have sanctioned Metricolor separately for its discovery violations with respect to each set of documents. *See* OB49.

Metricolor never argued to the district court that the court needed to segregate its sanctions analysis by type of document or type of spoliation. *See* 2-ER-46-63 (Metricolor's reply supporting reconsideration); 2-ER-120-49 (Metricolor's opposition to L'Oréal's second motion for sanctions); 11-ER-1394-1414 (Metricolor's motion for reconsideration). Because Metricolor did not raise this argument about "cumulative" sanctions before the district court, it forfeited the argument. *See O'Guinn*, 502 F.3d at 1063 n.3.

In any event, this argument misconstrues the law. Different acts of discovery-related misconduct need not be identical for a court to consider them together in imposing sanctions. Indeed, this Court long ago rejected an argument substantively indistinguishable from Metricolor's. In *Adriana*, the plaintiffs argued that the district court

66

abused its discretion by considering their violations of "court orders to produce documents" together with their "fail[ures] to appear at six separate depositions" when terminating the case. 913 F.2d at 1411-12. This Court rejected that piecemeal approach and held that "all" of the plaintiffs' wrongdoing could be considered together because "all the misconduct is of the same type: discovery abuses." *Id*. at 1412.

Like Metricolor, the plaintiffs in *Adriana* pointed to *United States v. National Medical Enterprises*, 792 F.2d 906 (9th Cir. 1986), for support—and found none. 913 F.2d at 1412; *see* OB49. *Adriana* explained that *National Medical* merely bars courts from bundling together incidents of misconduct that "differ[] in kind." 913 F.2d at 1412. Specifically, in *National Medical*, prior discovery-related sanctions against the government could not, by themselves, justify terminating sanctions for improper comments to a witness during trial. *See* 792 F.2d at 912. That is because those discovery-related sanctions did not "g[ive] clear notice" that the later misconduct "would result in a dismissal." *Id*. But *National Medical* "is inapplicable" when, as here, "all the misconduct is of the same type: discovery abuses." *Adriana*, 913 F.2d at 1412. *Faerfers v. Caviar Creator, Inc.*, which simply followed

67

*National Medical* and on which Metricolor also relies (at OB49), is

likewise "inapplicable" because it dealt with "different kind[s] of

misconduct." *Faerfers*, 359 F. App'x 739, 742 (9th Cir. 2009).[21]

In contrast, just as in *Adriana*, Metricolor's various misdeeds all

formed part of the same course of discovery abuses. Metricolor

fabricated, withheld, and destroyed documents in a concerted effort to

prop up its new trade-secret theory about its supposed first-generation

system. *Contra* OB61. As discussed above, the documents that

Metricolor deleted and withheld were closely related to the documents

that it fabricated. For example, Sal fabricated field-testing results

suggesting that salon owners wanted to use a product like the

Metricolor System, and Metricolor later withheld an email where Sal

bragged that he "made up" those test results. *Supra* 15-16, 24.

Metricolor provides no authority for its contention that district

courts assessing whether to impose terminating sanctions must ignore

---

[21] In *Faerfers*, the "different" types of misconduct were: (1) waiting until after jury selection to disclose information that required continuing the trial; and (2) failing to comply with orders requiring the transfer of stock. *See* 359 F. App'x at 741-42; *Faerfers v. Caviar Creator, Inc.*, No. 04-cv-02690, 2008 WL 1970325, at *1-*2 (E.D. Cal. May 2, 2008) (describing the misconduct that led to multiple forms of sanctions).

any discovery misconduct that involved documents produced or stored in different formats.  OB49.  This argument would lead to the absurd result of rewarding wayward litigants for diversifying how they spoliate evidence.  And that result would be particularly bizarre here, where Sal altered an email that must have been *originally* stored as ESI by printing it out, taping a fake email over it, and running it through a copier.  *See supra* 13-14.  Sal's choice for *how* to spoliate an email— electronically or in hard copy—should not affect the scope of the resulting sanctions.

## CONCLUSION

The district court was well within its discretion to dismiss this case as a sanction for Metricolor's flagrant discovery abuses. For the foregoing reasons, this Court should affirm the judgment.

Respectfully submitted,

/s/ Naomi J. Scotten

William Oxley
ORRICK, HERRINGTON &
    SUTCLIFFE LLP
355 S. Grand Avenue
Los Angeles, CA 90071

Lauren A. Weber
ORRICK, HERRINGTON &
    SUTCLIFFE LLP
401 Union Street
Suite 3300
Seattle, WA 98101

Naomi J. Scotten
Angela Colt
ORRICK, HERRINGTON &
    SUTCLIFFE LLP
51 West 52nd Street
New York, NY 10019
(212) 506-5000

*Counsel for L'Oréal USA, Inc.; L'Oréal USA Products, Inc.; L'Oréal USA S D Inc.; Redken 5th Avenue NYC, LLC*

February 19, 2025

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

**Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6**

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form17instructions.pdf*

**9th Cir. Case Number(s)** 24-3747

The undersigned attorney or self-represented party states the following:

[X] I am unaware of any related cases currently pending in this court.

[ ] I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

[ ] I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

**Signature** *s/ Naomi J. Scotten*      **Date** February 19, 2025

*(use "s/[typed name]" to sign electronically-filed documents)*

71

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** 24-3747

I am the attorney or self-represented party.

**This brief contains 12,922 words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[X] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties;
    [ ] a party or parties are filing a single brief in response to multiple briefs; or
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** *s/ Naomi J. Scotten*      **Date** February 19, 2025
*(use "s/[typed name]" to sign electronically-filed documents)*

72